## McGINNIS *vs.* THE STATE OF GEORGIA.

1. Where all the evidence has been allowed to go before the jury, and the Court is satisfied that the verdict is fully sustained by the proof, and the ruling of the Court upon the case is more favorable to the defendant than he had any right to ask or expect, a new trial will not be granted.

2. An involuntary killing happening in the commission of an unlawful act, which, in its consequences, naturally tend to destroy the life of a human being, or if committed in the prosecution of a riotous intent, or of a crime punishable by death or imprisonment in the penitentiary, shall be deemed and adjudged to be murder. Nor can the offence be excused or mitigated by proof, that the accused had no ill-will or actual malice toward the deceased.

Indictment for Murder, in Forsyth Superior Court. Tried before Judge RICE, at the April Adjourned Term, 1860.

Isaac Freeland, Jacob Pettyjohn, Levi Q. C. McGinnis, and William R. Braunon, were jointly indicted for the murder of Claiborn Vaughan. The first count in the indictment charged them all as principals in the first degree; and the second count charged Isaac Freeland as principal in the first degree, and the other four defendants as principals in the second degree. The defendants elected to be tried separately, and Levi Q. C. McGinnis was put upon his trial, when the following evidence was introduced, to wit:

---

**COMMUTATION OF DEATH PENALTY.** "The interpretation given to §63 of the Penal Code of 1895 by this Court, is that the punishment of murder when the defendant is convicted of that offense by direct testimony, shall be death, and unless the conviction is founded solely on circumstantial testimony, the jury have no legal right to commute the punishment for that offense by recommending imprisonment for life in the penitentiary. In other words, **when the defendant is convicted of murder by direct testimony, the jury cannot commute** the punishment of death as prescribed by the law of the State, **by any recommendation which they may make.** Merritt *v.* The State, 52 Ga. Rep. 82; Guilford *v.* The State, 24 Ga. Rep. 322; McGinnis *v.* The State, 31 Ga. Rep. 263; Long *v.* The State, 38 Ga. Rep. 492; Peterson *v.* The State, 47 Ga. Rep.

## Evidence for the State.

WILEY VAUGHAN testified: That he was the prosecutor in this case, and the brother of the deceased; that on the 7th of August, 1858, the witness, Claiborn Vaughan, William Buise, Samuel Buise, Abraham Buise, and Ransom Barnes, called the "Buise crowd," left Wild-cat Court ground, in Forsyth county, and started home by the usual and direct route; that witness and his brother, Clairborn Vaughan, were riding on horseback, whilst the balance of his crowd were on foot; that the Buise crowd were pursued and overtaken about a half a mile from the Court ground, by Isaac Freeland, Jacob Pettyjohn, Levi Q. C. McGinnis, and William Freeland and others, called the "Freeland crowd;" that the Freeland crowd had a torchlight, and came along singing a corn song, the words: "Walk, Tom Walker, walk away, you damned South Carolinians, walk away;" that all of those persons constituting the Buise crowd, were raised in the State of South Carolina; that as the Freeland crowd came up to the Buise crowd, Isaac Freeland, William Freeland, Jacob Pettyjohn, and Levi Q. C. McGinnis were foremost, and Levi Q. C. McGinnis said, "Where is Wiley Vaughan, the damned rascal who hit me on the head with a stick?" to which witness replied that he neither hit witness nor any one else on the head with a stick; that Isaac Freeland, and one or two others with him, then passed witness and ran on to where William Buise was; heard something like a lick, and the light was extinguished; that witness then jumped from his horse because some of the Freeland crowd was before him, and he wanted to get out of the way; that witness left Clairborn Vaughan sitting on his horse, by the side of the horse which he dismounted, and witness went off in the direction of home, and overtook William Buise and Samuel Buise near the branch, at which place Abraham Buise and Ransom Barnes soon joined them; that as witness went away from where he left Clairborn Vaughan, he heard several voices, or one voice several times, hallooing: hurrah! hurrah! hurrah, Freeland, which seemed to proceed from the spot where he left Clairborn Vaughan; that witness and those with him at the branch, remained there for an hour or more, waiting for Claiborn Vaughan to come along; that whilst they were thus waiting, the two horses which witness and deceased had been riding, came along; the horse that deceased had been riding, being

529." Shaw v. The State, 60 Ga. 251. As to right of jury to pass upon a question whether "the conviction is founded on circumstantial evidence." Id. pp. 254-5.
LIABILITY OF MEMBER OF MOB. "Where, at and before the killing, there was a great riot by many persons who composed a mob,

destitute of either bridle or saddle; that the crowd at the branch were joined by Marcellus Buise, William Buise, Jr., Elisha Buise, David Wilson, and, as witness thinks, old man Key; that a torch was procured, and the company returned to where Claiborn Vaughan was left, and found him lying in the road dead, and within a few feet of where he was when witness left him; the body of the deceased was very bloody and his shirt could not have been distinguished from red flannel, without close inspection, on account of it; that the ground was bloody, and some blood was spattered upon the saddle, which was lying in the road, bottom-side up, and the coat and hat of deceased were lying in the road near the saddle, and the hat was cut in two or three places; the deceased was killed about eight or nine o'clock at night, and in Forsyth county; that William Buise, Jr., was sent after the coroner, and that the balance of the Buise crowd and those that had joined them, remained with the body until morning, no one touching it until the coroner came.

On cross-examination, the witness further testified: that he was unable to identify the prisoner as one of the singers, whilst the Freeland crowd were pursuing the Buise crowd; that the witness had not hit prisoner with a stick, but he and witness and the deceased were all friendly with each other up to that time, so far as he knew; the deceased had been living, temporarily, with John Mathews, who lived on the road from Wild Cat Court Ground to Atlanta, but deceased was going home, on the night of the homicide, with the witness; that, so far as the witness knew, the deceased was on friendly terms with all the Freeland crowd up to the night of the killing; that on the morning after the homicide, Isaac Freeland came to where the body of the deceased was lying and said that he had been in an affray there last night and had lost his pocket-knife, and his son, William, had lost his pocket-combs, and that he had come back to look for them, and to see what was done, and said Freeland also said that he would as soon kill a man who would hit him on the head with a stick, as to kill a dog; that Isaac Freeland was bloody in his crotch, and between his legs, and about his pockets, and had blood spattered, more or less, all over him; that the witness did not see or hear the prisoner do or say anything out of the way on the night of the homicide, except the remark made to witness as they first came up, and which has been already repeated; witness gave a bond to prosecute this case.

and the accused was one of them, and took part in the riot, incited it, and was in great part responsible therefor, he was liable for each and every illegal act committed by such mob, and what was said and done by the mob, or any of its members, was proper evidence on the trial of the defendant." McRae *v.* The State, 71 Ga. 96 (2), 99. McGinnis *v.* State, 60 Ga. 263.

JEREMIAH FREELAND, testified: That he was at Wild Cat Court Ground, in Forsyth county, on the 7th of August, 1858, when a fight occurred between the prisoner and Abraham Buise; that, after the fight, there was a good deal of jowering about amongst each other, between the Buise crowd (which consisted of William Buise, Samuel Buise, Abraham Buise, Wiley Vaughan and Claiborn Vaughan), and the Freeland crowd, consisting of Isaac Freeland, Jacob Pettyjohn, Levi Q. C. McGinnis, James McGinnis, William Braunow, William Freeland and the witness; that, about the time and before the Buise crowd left for their homes, the two crowds were cursing each other back and forth, William Buise and the prisoner at the bar doing the bigger part of the cursing; that the Buise crowd, or rather William Buise, called the Freeland crowd rogues, hog-thieves, and the like, and prisoner and Jacob Pettyjohn replied, calling the Buise crowd the same; that this jowering and cursing continued until the Buise crowd started on home; that, after they had left a little while, Jacob Pettyjohn and William Freeland sent the witness after a torch-light, as they said, to hunt for a bottle and combs, said to have been lost; that, after some search for the things said to be lost, some one of the Freeland crowd (witness not remembering who it was) proposed to follow the Buise crowd—the specific object of the pursuit not being avowed; that the Freeland crowd then pursued the Buise crowd, singing a corn song as they went along; that witness went with the crowd to keep his father, Isaac Freeland, out of a difficulty, and witness tried to get his father and the Freeland crowd, generally, to go back, but could not; the Freeland crowd overtook the Buise crowd between a quarter and a half mile from the Court Ground; that, when the one crowd overtook the other, some of the Freeland crowd told William Buise (who were standing in the road with sticks) to get out of the road and let them go by, which they did; that the Freeland crowd then passed on and, coming up to Wiley Vaughan and the deceased, Isaac Freeland went up to Wiley Vaughan to show him where some one had struck him with a stick, to which Wiley Vaughan replied, "I did not strike you;" that Isaac Freeland then went up to Samuel Buise to show where he had been stricken, to which Samuel Buise replied: "I did not strike you;" that Isaac Freeland

**PUNISHMENT OF PRINCIPALS IN FIRST AND SECOND DEGREE.**
"There is no difference in this State between the punishment of a principal in the first degree and that of a principal in the second degree; and where this is true, it seems now to be well settled that there is no practical or material difference between principals of the two degrees on an indictment charging him as principal in the first degree; in other words, **an indictment charging one as principal in the first degree is supported by evidence** showing him to be a principal in the

then went up to old man William Buise for the same purpose, and William Buise replied: "It was not me that struck you, God damn you," and forthwith struck Isaac Freeland two blows and ran off down the road, all of the Freeland crowd, except witness, running after him; that in a few minutes, he heard hallooing as if they were fighting, and when he went down to where they were hallooing hurrah, Isaac Freeland was just getting up from Claiborn Vaughan, and Jacob Petty-john was sort of patting Isaac Freeland on the back, and the prisoner at the bar, and the rest of the Freeland crowd were standing around; that Claiborn Vaughan got up on his hands and knees and crawled to the upper edge of the road, saying: "Boys, I'm a dead man;" that prisoner .was standing close to deceased, rather to one side, when witness first went down to where they were crying hurrah; that the Freeland crowd then started back home, the way they had come, when pris-oner at the bar said wait a little; that witness then heard a sort of scuffling back at the place where Claiborn Vaughan was lying on the ground, and he looked back and saw the prisoner at the bar coming right from him, saying: "There is nothing wrong," or "nothing the matter," or something like that, and the Freeland crowd went on back toward the Court Ground to their homes; that on the way Isaac Free-land stopped at the branch to wash his hands.

The witness being cross-examined, further testified: That he knew of no common design or purpose on the part of the Freeland crowd to do any particular act when they overtook the Buise crowd; that the witness knew of no common cause of quarrel between the two crowds; that, so far as witness knew, prisoner and deceased were friendly up to that time; that the prisoner and Isaac Freeland had been unfriendly for about six years, and had had lawsuits with each other; that the witness is unable to identify prisoner as one of the singers, or one of those that hallooed hurrah, nor does he recollect any threat made by him after the pursuit of the Buise crowd commenced; that Isaac Freeland was drunk on the night of the killing, and as he went home, stopped and lay down some seventy-five or one hundred yards from the house, and fell asleep, was afterwards helped up and went home; that Claiborn Vaughan was pretty drunk on the night he was killed; that the witness was sworn and .testified on the trials of Isaac Freeland, and of Jacob Pettyjohn, and of James

second degree. This is especially true if the facts, as in this case, be such as that the act by which the crime is perpetrated, would, on es-tablished principles of law be imputed to him as committed by himself through the agency of another. I Bish. Crim. Law, §648; 2 Bish. Crim. .Proc., §3; Desty. Amer. Crim. Law, §36a; 2 Roscoe, Crim. Ev., pp. 752-3; Hill v. State, 28 Ga. 604; Leonard v. State, 77 Ga. 764; Ferguson v. State,

McGinnis vs. The State of Georgia.

McGinnis and William Braunow, in this Court, and also testified before the coroner's jury, and witness swore the truth each time; witness did not tell Hardeman Bone in his wheat field, during the harvest of 1859, that "he, witness, was not nearer than sixty yards to the place where the deceased was killed, on the night he was killed."

ABRAHAM BUISE, testified: That, on the 7th of August, 1858, at Wild Cat Court Ground, in Forsyth county, he and Jacob Pettyjohn were talking about some shooting that had been done that day, and the witness was trying to show that the judges had made a mistake in measuring the shots, and had awarded the money bet on the shooting to said Pettyjohn wrongfully, and whilst this talk was going on, James McGinnis winked at Pettyjohn and told him to knock witness down; that, whilst witness and James McGinnis were contending about the remark made by James McGinnis, which he denied making, Levi Q. C. McGinnis stepped up and said: "Say what you please, Jim, for I'm your friend, and if you can't whip him, I can," and began to roll up his sleeves; that old man William Buise interposed, and witness and prisoner agreed that they had no cause of offence at each other, and consented to drop the fuss; that prisoner then proposed to go and take a drink and drop it; whilst the drinking was going on, the prisoner kept saying: "Drink your damned Carolina liquor;" witness picked up his gun and told William Buise to "come and let us go home;" that one William Bayley, who was very drunk, wanted to shoot with witness for money, which witness declined, on the ground that a fuss had well-nigh resulted from what shooting had already been done; after some further wrangling, Bayley said he could beat witness shooting, or whip him either, to which witness replied: that, as drunk as he (Bayley) was, the witness could whip four such, if he were of a mind to lay himself out to fight; that prisoner then told Bayley to knock witness down, to which witness replied, he, prisoner, had better do it; that prisoner then seized witness' gun, and in scuffling over the gun, prisoner brought it a jerk and hit witness in the face with the butt of the gun; that witness then struck prisoner and they went to fighting; after the fighting ceased and the combatants were separated, witness sat down in the corner of the fence, and when asked by William Buise if he was hurt, witness answered that he was not, except where some

32 Ga. 658; McGinnis v. State, 31 Ga. 263; Plain v. State, 60 Ga. 284; Dumas v. State, 62 Ga. 58. The principle of the last four cases cited is that where persons conspire together to commit crime, and are present, countenancing or aiding it, the act of each is the act of all." Collins v. State, 88 Ga. 349-350.

one had struck him on the neck with a stick during the fight; prisoner then came up and said he intended to whip witness again; witness told him to let him alone, that his neck was hurt and that he did not intend to fight any more at that time; Isaac Freeland came up and said: "Boys, let him alone (that is witness), I consider him as begging;" prisoner then said to witness: "If you don't leave, I will kill the last damned South Carolinian there is of you," upon which Isaac Freeland told witness to get the old man Buise and leave, saying: "If you don't leave, there will be hell to pay here directly;" witness answered that if he had his gun and shot bag, he would go; witness and his crowd, called the Buise crowd, consisting of the three Buises, the two Vaughans and Ransom Barnes, then started home; from the main road, leading toward the homes of the Buise crowd, there was a little path to the spring, down which witness turned to get some water; whilst witness was drinking at the spring, the Freeland crowd (consisting of the persons named by the other witnesses) came on down the road to the place where the spring-path diverged, and were cursing witness and the Buise crowd, saying that they had better leave and go home, for that they were all run from their country for stealing or forgery, or some other damned meanness; witness being afraid to go back to the main road by the path leading to the spring, went through the swamp and joined his crowd some distance beyond where the Freeland crowd was; old man Buise replied to the charge of being run from our country for crime, by saying that prisoner was a damned old penitentiary convict; the Buise crowd then went on some distance further and halted for some little time, waiting for the Freeland crowd to go back, so that witness might return and get his shot-bag, which, in his hurry, he had left at the spring, and also get one of old man Buise's bridles, which the horse had slipped; whilst thus waiting, the Buise crowd discovered a light coming on from toward the Court Ground along the road after them, and the Freeland crowd came on singing a song to the words: "Walk, Tom Walker, walk away, we'll make the damned South Carolinians walk away;" the Buise crowd were all South Carolinians; when the Buise crowd saw the light coming and the Freeland crowd in pursuit of them, they started on toward home, going the direct road to their respective homes, except Claiborn Vaughan, who

---

**RIGHT OF JUDGE TO INTERROGATE WITNESS.** "In reference to the questioning of a witness by the court, we have to remark that, while it is the privilege of counsel, it is the **duty of the court to propound** such **questions to reluctant witnesses** (as the one in question had shown himself to be) as to strip them of the subterfuges to which they resort to evade telling the truth. Kelly's case, 19 Ga. 425, 426. The rule

was residing for the time at Mr. Matthews', but was going home with old man Buise, where his brother, Wiley Vaughan lived; the Freeland crowd continued to sing until they came up to within thirty or forty steps of the Buise crowd, when they rushed upon the Buise crowd; witness left the road some thirty or forty steps and sat down upon a log; when the one crowd rushed upon the other as before stated, something was said between old William Buise and Isaac Freeland, but the witness could not hear the words distinctly; then there was a lick struck and the light was extinguished, after which, for about a half minute, no one spoke, but from the noise it seemed that there were persons running; some one then spoke back at the place where witness left Claiborn Vaughan in the road, and said: "Is this Wiley Vaughan, the damned rascal that struck me with a stick, back at the Court Ground?" witness took the voice to be that of Isaac Freeland; the person addressed replied: "No, it is not Wiley Vaughan but Claiborn Vaughan;" this last voice witness took to be that of Claiborn Vaughan, with whose voice he is very well acquainted; the other voice then said: "You are a damned South Carolinian, and you were with the damned South Carolina crowd;" to which Claiborn Vaughan replied: "Yes, I am a South Carolinian and was with the South Carolina crowd, but I take no part in their fighting scrapes;" the other voice, which witness took to be Isaac Freeland's, then said: "We take in all the South Carolinians," or "it is South Carolina blood we are after;" then witness heard a lick struck with a stick, and from the noise it seemed as if some person fell, and witness then heard the words hurrah! hurrah! hurrah, Freeland, which seemed to be uttered by the whole crowd; witness then heard the voice, which he took to be that of Claiborn Vaughan, say: "Boys, I surrender," and then to cry "murder!" as often as twice—the last time with a sort of choking noise; witness then heard a noise as of some one scuffling, and it seemed that some one was kicking or knocking him in the body, at the same time saying: "Are you dead, God damn you, old man?" this the witness took to be Isaac Freeland from the voice; about one hour after this time, the witness, in company with the persons enumerated by Wiley Vaughan, returned to the place where he left Claiborn Vaughan, and found him lying in the road, dead.

was still more broadly laid down in McGinnis's case, 31 Ga. 261, 262, where it was held that it was not wrong for the presiding judge himself to interrogate the witnesses; that it was not only his privilege to do this, but his duty likewise, whenever he desired to ascertain a fact with a view to the correct administration of the law. In Epps's

The witness being cross-examined further testified that the deceased was not engaged in any quarrel or fight that day at the Court Ground, and, so far as witness knows, was friendly with every one of the Freeland crowd. There were members of each crowd who were friendly with each other, nor was there, on the day of the homicide, any quarrel or fight or difficulty, in which all of the one crowd were arrayed against all of the other. Isaac Freeland came to where the body of the deceased was lying, on the next morning after the homicide, and said that he understood old man Buise had hit him with a stick the night before, and he had as lief kill a man who would hit him with a stick as to kill a dog. All of the Buise crowd had drank some liquor that day, except Samuel Buise and Ransom Barnes. Witness testified before the coroner's jury, and on the trial of Isaac Freeland, and of Jacob Pettyjohn, and of James McGinnis and William Brannon, and on these different examinations swore the truth just as near as he could recollect it.

Dr. AARON P. BROWN testified: That he was a licensed practicing physician, and served as the surgeon of the coroner's jury, when an inquest was held over the body of Claiborn Vaughan; that the body was lying in the road leading off in an easterly direction from the Wild Cat Court Ground, in Forsyth county, and about a half a mile from said Court Ground. The body was very bloody, and the shirt in which it was clad could scarcely be distinguished from red flannel, so completely was it bathed in blood; there was a good deal of blood in the road round about where the body was lying. There was upon the body thirteen wounds, three or four of which were in the region of the left shoulder-blade, and penetrating to and hitting against the shoulder-blade; there were also two or three wounds in the region of the fourth and fifth short ribs, which penetrated to and hit against the ribs on the left side; there was one wound between the angle and the point of the chin, on the right side of the lower jaw-bone, about three inches long, and cut in an inward and downward direction, about an inch and a half deep; there was also a fatal wound on the left side of the neck, about two inches and a half long, cut in an inward and downward direction, and penetrating and opening the left external jugular vein, from which last wound the said Claiborn Vaughan died of hemorrhage in a short time after the infliction of the

case, 19 Ga. 102, 118, 119, it is said, "We know of **no limit to the right which belongs to the court of interrogating witnesses**, either in civil or criminal cases, particularly the latter." Varnedoe *v.* State, 75 Ga. 186; Kearney *v.* State, 101 Ga. 807.

wound; the other wounds upon the body were of a superficial character, and, in the opinion of the witness, all of the said wounds were inflicted with a knife or other sharp-edged instrument of like character.

The State also introduced in evidence the bill of indictment, with the verdict thereon of guilty of murder, against Isaac Freeland, and the sentence of death pronounced against him by the Court, and closed.

### Evidence for the Defendant.

MAHLON H. JAMES testified: That, as constable, he sent by the Corner to the defendant's house for the purpose of examining the clothes worn by the defendant on the night of the homicide, and was instructed to bring said clothes to the place of the inquest if he found blood on the clothes, and to leave them if he found no blood on them; that he did go, and did examine the clothes and found no blood upon them, and left them; that witness went to the Wild Cat Court Ground, on the morning of the 7th of August, 1858, in company with the defendant and the deceased, and they seemed to be perfectly friendly; that the defendant and Isaac Freeland had been unfriendly for eighteen months or two years before the homicide, and had had lawsuits and quarrels and one fight with each other; that Isaac Freeland was a stout man, and fractious, and would readily fight when insulted; that for two months before the homicide, there was bad feelings between Jacob Pettyjohn and the defendant, and they had had a difficulty which led to a prosecution of Pettyjohn by defendant, for an assault and battery. On the morning of the 7th of August, 1858, the deceased mended the shoes of defendant as a voluntary act of kindness.

Counsel also introduced in evidence a bill of indictment for assault and battery against Jacob Pettyjohn, found true by the grand jury, at the August Term, 1858, of Forsyth Superior Court, of which indictment the defendant was the prosecutor.

MATTHEW STRICKLAND testified: That he was at the place where the body of deceased was lying on the morning after the homicide; that Isaac Freeland came there with blood on his clothes, about his pockets, thighs, and other parts of his body. Freeland said that he had had a fight with Claiborn Vaughan there the night before; that he had been struck

with a stick and was very mad, and if he had done wrong he had done wrong.

HARDEMAN BONE testified: That he was at the Wild Cat Court Ground on the 7th of August, 1858, and saw deceased and defendant frequently together during the day at the wagon from which the witness sold liquor; that they seemed to be on friendly terms; they had come together to the still-house of witness a short time before that, and seemed perfectly friendly; that just about sundown the defendant bought a bottle of liquor and gave it to the deceased, upon deceased asking him for it, saying that he wanted it for a morning dram, and defendant had some at home; that Jeremiah Freeland cut wheat for the witness during the harvest of 1859, and in a conversation with witness the said Jeremiah Freeland remarked that he did not know that Claiborn Vaughan was killed until the next morning, and that he was about sixty-five or seventy yards from the fuss until it was all over.

JAMES R. BEAVER testified: That he saw Isaac Freeland on the day of the inquest on the body of Claiborn Vaughan; that said Freeland's clothes were bloody, and the inside of his pocket was bloody; that he has frequently seen the deceased and the defendant together, and they seemed perfectly friendly with each other.

The defendant then introduced the evidence as taken down by the Court on the trials of Isaac Freeland, and of Jacob Pettyjohn, and of James McGinnis and William Braunon, under the said indictment, for the purpose of showing that Jeremiah Freeland testified, on the trial of his father, Isaac Freeland, that when he went down to where the fight was going on, some one, whom he took to be William Braunon, was patting Isaac Freeland on the back whilst he was fighting Claiborn Vaughan; and that on the trial of Jacob Pettyjohn, he took said Pettyjohn to be the person who was patting Isaac Freeland on the back; and that on the trial of James McGinnis and William Braunon, the said Jeremiah Freeland testified that he, the witness, carried the light until the Buise crowd was overtaken by the Freeland crowd, when Isaac Freeland took the light from witness, and that witness thought the light was taken by Isaac Freeland after old man William Buise and Samuel Buise were passed in the road by the Freeland crowd.

It was admitted in open Court, by the counsel for the State, that Isaac Freeland had been executed according to the sentence pronounced against him.

The testimony being closed, the presiding Judge charged the jury as follows:

"All the presumptions of law, independent of evidence, are in favor of innocence, and every person is presumed to be innocent until he is proved to be guilty. The burden of the proof is, therefore, on the State, to establish, by evidence, the crime charged against the prisoner. In this case, the State must prove the death of Claiborn Vaughan, the persón alleged to have been killed, and that he died in consequence of the injuries inflicted upon him, as alleged in the bill of indictment; that Isaac Freeland was the slayer, and that the prisoner at the bar was present, aiding and abetting the fact to be done, and that the killing was of malice aforethought. In other words, it is incumbent on the State to prove: 1st. That the act was done, which constitutes the offence charged. 2d. That it was done by Isaac Freeland, and that the prisoner was present aiding and abetting the fact to be done. 3d. That the act was done with malice aforethought. The killing, with time and place, must be established; that is, it must be proven that the killing was done in this (Forsyth) county, and that it was done previous to the finding of the bill of indictment. A crime or misdemeanor consists in the violation of a public law, in the commission of which, there must be a union or joint operation of act and intention or criminal negligence. Intention will be manifested by the circumstances connected with the perpetration of the offence, and the sound mind and discretion of the accused. Murder is the unlawful killing of a human being, in the peace of the State, by a person of sound memory and discretion, with malice aforethought, either express or implied. Malice aforethought is the characteristic which distinguishes murder from every other degree of homicide. Malice is either express or implied. Express malice is that deliberate intention unlawfully to take away the life of a fellow creature, which is manifested by external circumstances capable of proof. Where a deadly weapon is used in the infliction of an injury, this is evidence of malice, unless the circumstances under which the weapon was used, or some other evidence, shows that malice did not exist, and that the

presumption of malice arising from the use of a deadly wea-
pon is rebutted. Whenever the fatal act is committed deliber-
ately and without adequate provocation, the law pronounces
that it was done of malice, and it behooves him who commit-
ted the act, to show from the evidence, or by inference from
the circumstances of the case, that the offence is of a miti-
gated character, or that the act was no offence at all; and
persons charged as aiders and abettors of the act may do the
same. Malice shall be implied where no considerable provo-
cation appears, and where all the circumstances of the killing
show an abandoned and malignant heart. This implied malice
is an inference or conclusion of law upon the facts which the
jury find proved. Malice is implied where an involuntary
killing is committed in the prosecution of a riotous intent,
and such involuntary killing is, therefore, deemed and adjudg-
ed murder. If Isaac Freeland inflicted the wound which
caused the death of Claiborn Vaughan, and if he was influ-
enced therein by malice, either express or implied, as the
Court has defined it, then Isaac Freeland was guilty of mur-
der, as principal, in the first degree; and if Isaac Freeland
was thus guilty of murder, and the prisoner at the bar was
present at the time the murder was committed, aiding and
abetting Isaac Freeland in the commission of such murder,
then the prisoner is guilty of murder, as principal, in the
second degree. The original bill of indictment, with the
judgment of conviction thereon against the principal in the
first degree, is admissible in evidence to prove *his* guilt, on
the trial of the principal in the second degree; and it is a
rule of evidence in such cases, that such record of the judg-
ment and conviction of the principal in the first degree is
conclusive evidence of his conviction, and *prima facie* evi-
dence of his guilt, upon the trial of a principal in the second
degree; and the burden of proof rests upon the principal in
the second degree, if he denies and disputes the guilt of the
principal in the first degree, to show that such principal in
the first degree ought not to have been convicted. If, in
this case, the State has shown by the record the trial and
conviction of Isaac Freeland, then, so far as the guilt of the
prisoner depends on, or is involved in the guilt of Isaac
Freeland, the burden is on the prisoner to show that Isaac
Freeland ought not to have been convicted of murder—that
he was not guilty of murder. If the jury are satisfied from

the evidence, that Isaac Freeland killed Claiborn Vaughan, the deceased, and that in doing so he committed the offence of murder, then the next inquiry for the jury will be, whether or not the prisoner at the bar was present aiding and abetting Isaac Freeland in the commission of that murder? All who are present aiding and abetting him who inflicts the mortal blow in cases of murder, are principals and criminals. A person may be a principal in an offence in two degrees. A principal in the first degree is he who is the actor or absolute perpetrator of the crime. A principal in the second degree is he who is present aiding and abetting the fact to be done, which presence need not always be an immediate standing by, within sight or hearing of the fact, but there may be a constructive presence, as when one commits a robbery, murder, or other crime, and another keeps watch or guard at some convenient distance.

"Involuntary manslaughter shall consist in the killing of a human being without any intention to do so; but in the commission of an unlawful act, or a lawful act which probably might produce such a consequence, in an unlawful manner; provided, always, that where such an involuntary killing shall happen in the commission of an unlawful act which, in its consequences, naturally tends to destroy the life of a human being, or is committed in the prosecution of a riotous intent, or of a crime punishable by death or confinement in the penitentiary, the offence shall be deemed and adjudged to be murder.

"The Penal Code of Georgia provides that where an involuntary killing is committed in the prosecution of a riotous intent, the offence shall be deemed and adjudged to be murder.

"If any two or more persons, either with or without a common cause or quarrel, do an unlawful act of violence, or any other act, in a violent and tumultuous manner, such persons so offending shall be guilty of a riot. A riotous intent means an intent to do an unlawful act of violence, or any other act, in a violent and tumultuous manner, in which intent two or more persons must be joined. It means a common design in which two or more persons are united to do an unlawful act of violence, or any other act, in a violent and tumultuous manner. This riotous intent must be proved; but, like any other fact, it may be proved by circumstantial

or direct evidence, or by evidence partly direct and partly circumstantial. This riotous intent may be proved, by proof of a common design to do an unlawful act of violence or any other act in a violent and tumultuous manner in which common design two or more persons unite, and by proof of acts done in pursuance of such common design. It is not necessary to prove that the parties to that common design actually came together and agreed in words and terms to have a common design, and to pursue it by common means. If it be proved that those persons who are engaged in a common purpose, pursue by their acts the same object, often by the same means, one performing one part, and another another part, toward the accomplishment of the same object, so as to complete it, the jury will be justified in the conclusion that they were engaged in a combination or conspiracy to effect that object."

The Court also, at the request of counsel for the State, charged the jury as follows, to wit:

"It is not necessary to prove that the combination or conspiracy originated with the prisoner at the bar, or that he met with others during the time the combination, conspiracy or common design was being formed, for every person who enters into a combination, conspiracy or common design already formed, is deemed, in law, a party to all acts done by any of the parties afterwards in furtherance of the common design. If the jury are satisfied from the evidence in this case that there was a common design, combination or conspiracy into which the prisoner entered, and if the evidence satisfies the jury that he was in a situation where he could give aid, and that he was ready to give and could give, such aid to the perpetrator of the act growing out of the common design, or connected with it at the time the act was perpetrated, it will be presumed that he was there for the purpose of giving the aid, unless it be shown satisfactorily that he was there for another purpose unconnected with the crime.

"If a company of persons are actuated by one common intent, the acts and sayings of the company and each member of it are admissible in evidence against any and every member of the company. If, therefore, the jury believe, from the evidence in this case, that the prisoner and the crowd he was with were actuated by the same purpose, then he was not only with the crowd, but he was of the crowd, and

the sayings and acts of any member of the crowd were his sayings and acts, whilst the common purpose was being carried on.

"If several persons engage in such a breach of the peace as in its consequences naturally tends to destroy human life, or engage in the prosecution of a riotous intent, or engage in the commission of any felony, and in carrying out the purpose, and connected with its execution a human being is killed, it is murder in every one engaged in the common design, whether he struck the blow with his own hands or not."

The Court then, without request, charged the jury as follows:

"If it is satisfactorily proved that Claiborn Vaughan was killed by Isaac Freeland in the prosecution of a riotous intent, and that the prisoner was engaged with Isaac Freeland in the prosecution of that riotous intent, then the prisoner at the bar is guilty of murder as principal in the second degree. Where, however, a homicide is committed by one or more of a body of men, unlawfully associated, from causes having no connection with the common object, the responsibility for such homicide attaches exclusively to its actual perpetrator."

At the request of prisoner's counsel, the Court charged the jury as follows:

"First. To constitute a crime, it is necessary that there be a union or joint operation of act and intention.

"Second. The law presumes the prisoner innocent until the contrary appears, and this legal presumption of innocence is to be regarded by the jury as evidence, to the benefit of which the prisoner is entitled, and it is for the State to prove the prisoner's guilt, and not for the prisoner to prove his innocence.

"Third. The law requires that, unless the jury are satisfied from the evidence, beyond a reasonable doubt, that the prisoner is guilty of the crime charged, they must acquit him; that this reasonable doubt is that state of the case which, after the entire comparison and consideration of all the evidence, leaves the mind of the jurors in that condition that they can not say that they feel an abiding conviction to a moral certainty of the truth of the charge; that the simple rule on this subject is, that the jury must not convict the prisoner without plain and manifest proof of his guilt, and

that each separate fact necessary to constitute the prisoner's guilt must be proven; for the law holds, that it is better that ten guilty persons escape than that one innocent man should suffer.

"Fourth. To authorize the jury to convict on circumstantial evidence, it must appear plain and manifest that the facts in evidence are not only consistent with the prisoner's guilt, but inconsistent with any other rational conclusion, and each fact necessary to the conclusion sought to be established, must be proved by competent evidence beyond a reasonable doubt. All the facts must be consistent with each other and with the main fact sought to be proved, and the circumstances taken together must be of a conclusive nature, and leading on the whole to a satisfactory conclusion which produces a reasonable and moral certainty that the prisoner, and no other, committed the offence charged, or that the prisoner aided, and abetted, and assisted in the commission of such offence.

"Fifth. Before the prisoner can be held accountable for the acts, threats or words of Freeland, or any other person, it must plainly and manifestly appear, by the evidence, that there was a common purpose, design or agreement between the parties, and it must also appear by the proof what that common design, purpose or agreement was, and that the common purpose, design or agreement was unlawful, and it must also appear that the prisoner was a party to the design, purpose or agreement, to which the words, acts or threats of Freeland, or such other persons related.

"Sixth. Before the prisoner can be held accountable for the acts of Freeland, or any other person, it must appear to the jury by evidence (and of this as well as all other facts thereof, must be satisfied beyond a reasonable doubt), that such acts were strictly in prosecution of the purpose for which the party assembled; for if three persons go out to commit a felony, and one of these, unknown to the others, puts a pistol in his pocket, and commits a felony of another kind, such as murder, the two who did not concur in this second felony, will not be guilty thereof, notwithstanding it happened whilst they were engaged with him in the felonious act for which they went out; and it is a question for the jury whether the act done, was done in the prosecution of the purpose for which they assembled, or was independent and outside of such purpose, and without any previous concert.

"Seventh. That malice is a necessary ingredient of the crime of murder."

The Court refused to charge the remainder of this seventh item of the request, to wit:

"And where the circumstances of the killing, according to the evidence, are such as would raise a presumption of malice under the ninth section of the fourth division of the Penal Code, as to homicide in the prosecution of a riotous intent, that that is a presumption of fact which may be rebutted or explained by proof, and if the jury believe, from all the evidence in this case, that the prisoner was not in fact actuated by malice, then he is not guilty of murder under that section of the Penal Code."

Eighth. The Court resumed the charges, requested by the defendant's counsel, as follows:

"Where several persons are present at the killing of a man, they may be guilty of different degrees of homicide, as one of murder, and another of manslaughter, but a person may be present, and if not aiding and abetting, be neither principal in the first or second degree, or accessory, as if A. be present at a murder and take no part in it, nor endeavor to prevent it or to apprehend the felon, this conduct, though highly criminal, will not, of itself, render him either principal or accessory."

"Ninth. To impeach a witness by showing that he has made contradictory statements, it is not necessary that he deny the declarations imputed to him. It may be done when he says he does not recollect, if the subject-matter of the conversations relative to the issue. If Jeremiah Freeland stated that he did not recollect having a certain conversation with Hardeman Bone, and it is shown by the proof that he did have the conversation, if the conversation is relevant to the issue, then he is successfully impeached." Here the Court added: "If the jury shall believe that he testified falsely when he said that he did not recollect the conversation." The Court, resuming the request, charged also: "And if the conversation had reference to the distance that Jeremiah Freeland was from where the deceased came to his death; then the conversation was material to the issue."

"Tenth. Where a witness testifies falsely as to a leading fact, respecting which there could be no mistake or misapprehension by him, he is not entitled to any credit in any

of his testimony. If it has been shown to the jury that Jeremiah Freeland, at one time, testified that, during the time Isaac Freeland and deceased were engaged in fighting William Braunon patted his father, Isaac Freeland, on the back, and, at another time, testified that it was Jacob Petty-john that patted Isaac Freeland on the back, the Court charges you that that is a leading fact.

"Eleventh. In a criminal case the jury are the judges of the law as well as the fact, and each juror is accountable for the verdict of the body; and if any one of the jury should not be satisfied beyond a reasonable doubt of the guilt of the prisoner, they could not convict him," to which the Court added, "that the jury could not render a verdict unless all agreed on the verdict," and then resumed the request to charge:

"Twelfth. It is not in every homicide, where the persons present aiding and abetting the actual perpetrator of the homicide are guilty of murder. If a sudden fight spring up between two men and the spectators, or those standing around, encourage one party by hallooing hurrah, or otherwise, believing it to be a mere fight, and not knowing that the party they encourage is killing the other, and such party actually kills the other without the knowledge or concurrence of such spectators or bystanders, while it is murder in the actual slayer, it would only be involuntary manslaughter in the commission of an unlawful act in such spectators. And if in this case the jury believe that the Freeland crowd pursued the Buise crowd, to whip old William Buise, and that they passed Claiborn Vaughan in the road, and went up to William Buise, and that William Buise, after striking Isaac Freeland with a stick, ran off and the Freeland crowd pursued him until the object of the pursuit was either accomplished or frustrated, and that then the Freeland crowd turned round and started home, and Isaac Freeland got into a fight with Claiborn Vaughan, and that prisoner encouraged Freeland in the fight, believing and supposing that it was a mere fight, and not knowing that Freeland was killing Vaughan, then the prisoner is not guilty of murder, but is guilty of involuntary manslaughter in the commission of an unlawful act."

When the presiding Judge had finished charging the requests of defendant's counsel, as aforesaid, without being

McGinnis vs. The State of Georgia.

requested by either party, but stating it to be in explanation of the charges given at the request of counsel for defendant, and for the purpose of simplifying the same, he proceeded to charge the jury, further, as follows:

"It is material that the jury inquire, when and under what circumstances the deceased was killed. If he was not killed by Isaac Freeland, whilst Isaac Freeland and those with him were engaged in the prosecution of a riotous intent, but was killed in a sudden fight which occurred between him and Isaac Freeland, then the Court charges you that, although Freeland may have engaged in the fight, of malice and with intent to kill, and the prisoner, free from such malice and intent to kill, may have taken sides with Freeland, and encouraged him by words, yet he would not be guilty of murder; in such a case, the prisoner would be guilty of involuntary manslaughter in the commission of an unlawful act. In trials of fact, the fact may be proved directly by those who speak from their own actual, personal knowledge of its existence; this is called direct or positive testimony. Or the fact to be proved, may be inferred from other facts satisfactorily proven; this is what is termed circumstantial evidence. A verdict may well be founded on circumstantial evidence alone, and circumstances often lead to a conclusion as satisfactory as direct evidence can produce. All the facts in this case, which are established before you by competent and satisfactory evidence, whether direct or circumstantial, it is your duty to find proved.

The jury returned a verdict, finding the defendant guilty of murder, as principal in the second degree. Counsel for the defendant then made a motion for a new trial in said case, on the following grounds:

1. Because the verdict of the jury was contrary to law and evidence.

2. Because the verdict was strongly and decidedly against the weight of the evidence.

3. Because there was no evidence that the defendant aided and abetted in the killing of deceased.

4. Because there was no evidence that the defendant was present at all at the killing of deceased, except the evidence of Jeremiah Freeland, who was successfully impeached by other testimony.

5. Because there is no sufficient evidence of a combination

or conspiracy among the pursuing party, for any common purpose or design; and if any common design was shown at all, it was a design different from killing or injuring deceased. On the contrary, the evidence showed that there was no common cause of quarrel between the two crowds, some of the members of each crowd being friendly, especially the defendant and deceased.

6. Because, if any common purpose or design was shown by the evidence, the evidence also showed that that common design or purpose was accomplished or frustrated before the deceased and Isaac Freeland had the fight which resulted in deceased's death, and that that difficulty was collateral to, and outside of the design; and the evidence does not show that the defendant aided and abetted Isaac Freeland in the fight with deceased, and if it did, it does not show that defendant knew that Freeland intended to kill, or was killing or stabbing deceased; and, in these particulars, the verdict is directly contrary to the charge of the Court.

7. Because the Court erred in admitting evidence about the quarreling and fighting at the Court Ground on the day of the killing, at night, counsel for the defendant objecting to such evidence.

8. Because the Court erred in this, to wit: When the solicitor-general had examined Abraham Buise, a witness for the State, and was in the act of turning him over to the defendant's counsel, the Court requested the solicitor-general to ask the witness a question, in answer to which the witness located the place from which the noise and words, etc., testified to by him, proceeded, which place was the spot where he left deceased in the road; to which request of the Court the solicitor-general replied that he had shown that by Wiley Vaughan; the Court repeated the request, and the solicitor-general asked the question, at the suggestion and request of the Court.

9. Because the Court erred in admitting in evidence the following statement of Abraham Buise, a witness for the State, to wit: "I heard a noise as if some person was kicking or knocking him (meaning the deceased) in the back," counsel for defendant objecting to the mode of describing the noise.

McGinnis vs. The State of Georgia.

10. Because the Court erred in refusing to charge as requested by the defendant's counsel: That where the circumstances of the killing, according to the evidence, are such as would raise a presumption of malice, under the 9th section of the 4th division of the Penal Code, as to homicide in the prosecution of a riotous intent, that it is a presumption of fact which may be explained by proof, and if the jury believe from the evidence that the defendant was not, in fact, actuated by malice, then he is not guilty of murder under that section of the Code.

11. Because the Court erred in reading to the jury the definition of a riot from the Penal Code, and charging the jury in explanation of riotous intent under the 9th section of the 4th division of the Code, as follows: "Riotous intent means an intent to do an unlawful act of violence, or any other act, in a violent and tumultuous manner, in which intent two or more persons must be joined," said charge having no application to this case; and because the whole charge of the Court, except that portion given at the request of defendant's counsel, was contrary to law.

The presiding judge overruled the motion and refused a new trial, and defendant's counsel excepted.

Counsel for defendant then moved the Court to commute the punishment of the defendant from death to that of perpetual penitentiary confinement, which the Court refused to do, remarking at the same time, that he would gladly do so, if the circumstances of the case would admit of it, but believing that this was not such a case of circumstantial evidence *alone* as was contemplated by the statute, he felt constrained to refuse to commute the punishment; the defendant's counsel excepted.

The presiding judge then passed sentence upon the prisoner, directing his execution to be done "publicly," and at the place of "public" execution; and defendant's counsel excepted.

These rulings of the Court, refusing a new trial; refusing a commutation of the defendant's punishment, and in directing his execution to be "public," constitute the errors assigned in this case.

J. R. BROWN and H. P. BELL, for plaintiffs in error.

WM. PHILIPS, Solicitor-General, *contra*.

*By the Court.*—LUMPKIN, J., delivering the opinion.

We do not deem it necessary or proper to discuss, separately and at length, all the grounds taken in this writ of error.

The defendant has been tried and convicted as principal, in the second degree, for the murder of Claiborn Vaughan, one Isaac Freeland having been condemned and executed as the actual perpetrator of the deed.

To better understand the questions of law in the case, it is well to consider, first, whether the verdict is contrary to the evidence. I will state the testimony briefly, omitting all minor facts and circumstances which do not materially affect the case:

In August, 1858, there was a gathering in Forsyth county, at a place called Wild-Cat Court Ground. Amongst the crowd, thus assembled, there appears to have been some half dozen South Carolinians, and they constituted what is called in the evidence, the Buise crowd. The accused belonged to what was designated as the Freeland crowd. Claiborn Vaughan, the man killed, was a South Carolinian. The defendant and one Abraham Buise had had a fight late that evening, in which McGinnis got the best of it. Indeed his whole conduct, on that occasion, was that of the bravado and the bully; and notwithstanding Isaac Freeland acted a more prominent part than McGinnis in the subsequent scene of the tragedy, yet it was not so in the beginning, for at the Court Ground, and up to the time of the departure of the Buise party, the conduct of Isaac Freeland was rather that of a peacemaker than otherwise.

It is important to ascertain the feelings of McGinnis toward the Buise crowd. For although there appears to have been no personal ill-will entertained by him toward Claiborn Vaughan, still the proof demonstrates that his hostility extended to the whole of that crowd. In the course of the altercations and scuffles between Abraham Buise and himself, it was agreed that they should drink together and drop their quarrels; and yet while in the act of drinking, McGinnis continued to repeat, "drink your damned Carolina liquor;"

and this is the first development of the enmity toward that party, as such. Again: when Abraham Buise refused another fight with him, and was about leaving, McGinnis said, "If you don't leave I will kill the last damned South Carolinian that is of you." Here the spirit of the partisan had got the mastery over all personal likes and dislikes; and this is no new phase of human nature—with all associations it is enacted daily before our eyes. The Democrat and the American will each forget, in a day, the friendship of a long lifetime, so soon as his party blood is boiling. After such a declaration or threat as that just quoted, it is needless to invoke the former difficulties between McGinnis and some of the Freeland crowd, or the kindly relations which had subsisted, down to the morning of that fatal day, between himself and Claiborn Vaughan.

The Buise party left, all in the right direction for their respective homes. Abraham Buise turned out of the main road to a spring to get a drink of water, while these, McGinnis and the opposite party, started in the same direction, but going directly from their respective homes. They began to curse the Buise party, telling them "they had better go home, for that they were *all* run from their county for stealing or forgery, or some other damned meanness." Old man Buise replied to McGinnis, "that he was a damned old penitentiary convict." And from this response, we gather that McGinnis was the spokesman and leader of his gang.

The Buise crowd proceeded some seventy-five or one hundred yards and halted, one of them returning to get the shot-bag he had left at the spring, and old man Buise's bridle. The Freeland crowd went back to the Court Ground. Soon they were observed coming back with a torchlight, shouting and singing like drunken men: "Walk, Tom Walker, walk away, we'll make the damned South Carolinians walk away." The Buise party set off and got some quarter of a mile ahead. The pursuing party, after momentarily halting, some forty yards distant, approached them rapidly. One of the witnesses testifies that it was McGinnis who exhibited a wound upon his head and asked several if they had stricken him. But the weight of the evidence is, that it was Isaac Freeland who made this inquiry. When Isaac Freeland interrogated old Wm. Buise about the matter, he struck him one or two blows with his stick, when he, and most of his crowd fled and concealed themselves.

The pursuing party had passed Claiborn Vaughan upon his horse in the road, and after the affair between Isaac Freeland and Wm. Buise, the former returned to where Claiborn Vaughan was, and addressing him as *Wiley* Vaughan—who was in the company—he said: "Is this Wiley Vaughan, the rascal who struck me with a stick?" Claiborn Vaughan replied: "I am not Wiley Vaughan, but Claiborn Vaughan." Isaac Freeland said: "You are a damned South Carolinian, and with that crowd." Claiborn Vaughan answered: "I am a South Carolinian, and with that crowd, but took no part in their fighting scrape." Isaac Freeland retorted: "We take in all South Carolinians," or "it is South Carolina blood we are after." Both expressions may have been used.

And now the fatal catastrophe ensued; Claiborn Vaughan was stricken down; whether he was dismounted at the time, or was knocked off his horse, is not certain. And now the shout of encouragement was heard: "hurrah, Freeland! hurrah, Freeland!" Claiborn Vaughan cried: "Boys, I'm murdered." Next, "murder, murder," the last wail in a choking voice, as his life-blood was fast ebbing out to glut the vengeance of an infuriated mob! Isaac Freeland, with a callousness without a parallel, said: "are you dead, God damn you, old man," or "old fellow!" McGinnis was there all this time.

After Isaac Freeland had left his victim, McGinnis being near, some noise was heard like scuffling or, as one of the witnesses described it, as if some one was knocking or kicking the body of another. When McGinnis joined his crowd, and the question was asked if there was not some fighting back there where Claiborn Vaughan was murdered, he replied, "no, there was nothing wrong," or "nothing the matter." The last sight seen of Claiborn Vaughan that night, he was on his all-fours.

For the sake of our common humanity, I shall assume, in this opinion, although there is strong testimony to the contrary, that after the brutal butchery of the unoffending man, by Isaac Freeland, that no more violence was inflicted upon his person. He was stabbed in thirteen places; the jugular vein being almost cut asunder, and done, probably, with the knife of Isaac Freeland, while his helpless and imploring victim was prostrate on his back, and his butcher

a-straddle of him. The wounds upon the body of the deceased, as well as the blood upon the pantaloons of Isaac Freeland, justify the foregoing supposition. There could be no motive for stamping one even thus pierced and hacked to pieces, except as we would a slaughtered swine or beef-cattle, to drain the last drop of blood from the body.

So much for the evidence in this case. In the opinion of this Court, it fully authorized the finding of the jury, that the defendant was present aiding and abetting in this horrible homicide. If it be asked what motive had McGinnis in aiding and abetting in killing Claiborn Vaughan, I reply, what motive had Isaac Freeland for killing him? Did the Court err in the administration of the law in this case?

1. It is assigned as error, that the Court admitted evidence of the quarreling and fighting at the Court Ground on the day preceding the killing.

The answer to this complaint is twofold: In the first place, it was necessary to let in this proof in order to understand the state of feeling which actuated the various persons who were engaged in this transaction, and which finally separated them into two distinct crowds. Testimony had already been admitted, not only to show the absence of any bad feeling on the part of McGinnis toward Claiborn Vaughan, but also to establish that difficulties had previously existed between McGinnis, Freeland and others on that side, and which continued down to the day of the homicide. It was right and proper, then, to prove how all these previous relations had been merged and forgotten, as manifested by the occurrences of that day, and how new combinations had, for the time at least, taken their places.

But, secondly, from the first difficulty between McGinnis and Abraham Buise, until the curtain fell over the gory corse of Claiborn Vaughan, it was one continuous controversy, smothered awhile, occasionally, and then breaking out with renewed violence, and spreading and enlarging at every recurrence, until the Savannah river became the line of division between the parties.

2. It is assigned as error, that, by the direction of the Court, the solicitor-general was compelled to ask the witness, Abraham Buise, a question. We have already held that it is not wrong for the presiding judge himself to interrogate the witnesses. It is not only his privilege to do this, but, we

apprehend, his duty likewise, whenever he desires to ascertain a fact with a view to the correct administration of the law. If the judge himself may propound questions for the purpose of eliciting the truth upon any given point, he may direct the State's officer to do so.

3. As to objection to the testimony of Abraham Buise, that, after Isaac Freeland had left the deceased, when McGinnis lingered behind, he heard, from his retreat by the roadside, to which he had fled, "a noise like some one was kicking or knocking Claiborn Vaughan," what was there wrong in that? It is argued that the illustration was too personal in its application. It was just what it should have been. The witness may have been mistaken. It was for the jury to judge of that.

4. There is but a single ground taken in the motion for a new trial that has any apparent merit in it, and that, we think, is founded in a total misapprehension of the true meaning of the ninth section of the fourth division of the Penal Code. It is the section which treats of *involuntary* manslaughter. It declares that "involuntary manslaughter shall consist in the killing of a human being without any intention to do so; but in the commission of an unlawful act or a lawful act which probably might produce such a consequence, in an unlawful manner." And then follows this important qualification: "Provided, *always,* that where such involuntary killing shall happen in the commission of an unlawful act, which, in its consequences, naturally tends to destroy the life of a human being, *or is committed in the prosecution of a riotous intent,* or of a crime punishable by death or confinement in the penitentiary, *the offence shall be deemed and adjudged to be murder."*

The charge requested was, that the presumption of malice, arising from the circumstances to which this section refers, was a fact, and one which might be rebutted by proof.

Such is not our interpretation of the Code. Whenever the life of a human being is destroyed, under the state of facts contemplated by this section, the offence shall be deemed murder, and such is the judgment which the law pronounces upon it. Suppose the life of a human being is destroyed where no considerable provocation appears, and where all the circumstances of the killing show an abandoned and malignant heart, is not the offence murder? And is not

McGinnis vs. The State of Georgia.

this the stern judgment of the statute, wholly irrespective of the past or present relations subsisting between the slayer and the slain? If I discharge a loaded gun or pistol at a crowd and kill my best friend, is not this murder? Who ever doubted it? Just so where the killing is committed in the prosecution of *a riotous intent.*

If two or more persons assemble in some public place, and having prepared a balloon, seize and fasten to it the first pass-er-by and cause it to ascend for the amusement of the multitude, and by some casualty death ensues, is it any de-fence to allege and prove that the rioters were not actuated by any personal ill-will toward the victim of their reckless sport? On the contrary, the Code declares that each and every one concerned shall be guilty of the crime of murder, and, upon conviction, shall be hung by the neck till they are dead. It refuses to show pity to those who were deaf to the appeals for mercy and the tortures and sufferings and dying agonies of others.

The instructions of the Court were far more favorable to the prisoner than he was entitled to under the law. The riot-ous intent of this Freeland crowd, to perpetrate an unlawful act, was fully and satisfactorily established. What their pre-cise purpose was we are left to conjecture. Perhaps they had no very definite plan themselves. It was to chase away and beat, or otherwise maltreat the South Carolinians, and to use their own dialect, to take their blood—and most wantonly and wickedly did. They imbrued their hands in the life-blood of an unoffending man. I say their hands, for the hand of one was the hand of each and all. It is immaterial who inflicted the mortal wounds. The rest were standing around hurraing their comrade, and by their presence fright-ening off and keeping away the friends of the deceased, who might, but for them, have come to his rescue. All are, in the eye of the law, equally guilty, and all are like punish-able.

We concur with the Court, that this conviction was not founded upon circumstantial evidence, and that he had no dis-cretion as to the mode of punishment.

The execution, we hold, should have been under the Act of 1859.

## JUDGMENT.

Whereupon, it is considered and adjudged by the Court, that the judgment of the Court below be affirmed, except as to the public execution of the prisoner..