## 5162.   SILVER *v.* THE STATE.

1. It is a penal offense to give, furnish, or sell any of the narcotic drugs mentioned in the statute . (Acts of 1907, p. 121, Civil Code, § 1651), except upon the conditions prescribed therein.
2. The statute regulating the furnishing or sale of narcotic drugs was intended not only to prevent traffic in such drugs, but also to lessen the evil consequent upon the habitual use of such narcotics.
3. Where a person, in violation of the statute, administers, by means of a hypodermic syringe, morphine to another in such quantity as to cause death, he commits an unlawful act, and a conviction of involuntary manslaughter in the commission of an unlawful act would be authorized. It would be no defense that in the administration of the drug the intent was not to cause death, but to alleviate pain.
4. The charge of involuntary manslaughter in the commission of an unlawful act can be based upon an act malum prohibitum as well as upon an act malum in se.
5. No material error of law appears, and the evidence supports the verdict.

DECIDED OCTOBER 30, 1913.

Conviction of manslaughter; from Chatham superior court—Judge Charlton. August 11, 1913.

*Shelby Myrick,* for plaintiff in error.

*Walter C. Hartridge, solicitor-general,* contra.

HILL, C. J. Isaac Silver was convicted of the offense of involuntary manslaughter in the commission of an unlawful act. On arraignment he demurred, on general and special grounds, to the indictment. The demurrer was sustained in part and overruled in part. Subsequently he made a motion for a new trial on the general grounds, and on numerous special grounds. The motion was overruled and he excepted. The first count of the indictment charges "the offense of involuntary manslaughter, for that the said Isaac Silver, in the County of Chatham and State of Georgia aforesaid, on the 8th day of March, in the year of our Lord one thousand nine hundred and thirteen, with force and arms, and without any intention to do so, but in the commission of an unlawful act, to wit, by furnishing and giving away to one Esther O'Marea, alias Marion Leonard, morphine, not upon the original written order or prescription of a lawfully authorized practitioner of medicine, dentistry, or veterinary medicine, which said morphine was furnished and given away by the said defendant to the said Esther O'Marea, alias Marion Leonard, by administering the same to her by means of a hypodermic syringe, by reason of which administration said Esther O'Marea, alias Marion Leonard, was then and there killed;

the said Isaac Silver then and there well knowing the loss of life as aforesaid to be a possible consequence of the unlawful giving away and furnishing in manner aforesaid of said morphine, did then and there unlawfully and feloniously kill said Esther O'Marea, alias Marion Leonard, contrary to the laws of the State, the good order, peace and dignity thereof."

The second count in the indictment charged the offense of involuntary manslaughter in the commission of a lawful act without due caution and circumspection. This ground was stricken on demurrer. The indictment as a whole and the first count specifically were demurred to on the ground that the allegations were not sufficient to show a violation of the criminal laws of Georgia. The first count was demurred to also on the grounds, that it did not state the exact quantity of morphine administered, and that it did not state how or in what manner the deceased was killed by the administration of the morphine,—that the allegation that by reason of such injection the said Esther O'Marea, alias Marion Leonard, was killed was a mere conclusion. These special grounds are manifestly without merit. It was not necessary to state the exact quantity of morphine administered; it was sufficient to allege that the deceased was killed by the administration of morphine by the defendant. The quantity was wholly immaterial. The first count does state specifically that Esther O'Marea, alias Marion Leonard, was killed by the accused by administering morphine to her "by means of a hypodermic syringe, by reason of which administration said Esther O'Marea, alias Marion Leonard, was then and there killed." The sentence as a whole is not a conclusion, but the statement of fact.

There was no error in overruling the demurrer on the general ground. The act of 1907 (Acts of 1907, p. 121) contained in section 1651 of the Civil Code, declares that "it shall be unlawful for any person, firm, or corporation, to sell, furnish, or give away any cocaine, alpha or beta eucaine, opium, morphine, heroin, chloral hydrate, or any salt or compound of any of the foregoing substances, or any preparation or compound containing any of the foregoing substances or their salts or compounds, except upon the original written orders or prescription of a lawfully authorized practitioner of medicine, dentistry, or veterinary medicine," etc., and section 459 of the Penal Code provides that any person who

shall violate any of the provisions of section 1651 of the Civil Code, supra, shall be guilty of a misdemeanor. It was insisted by the learned counsel for the plaintiff in error that this statute was never designed to cover an isolated instance of the administration of morphine by means of a hypodermic syringe, especially where the morphine was administered without charge, at the request of a party suffering pain; that the law in question was intended only to operate against persons selling the narcotic drugs mentioned in the act. This argument was based in part upon the caption of the original act, which is in the following language: "An act to provide against the evils resulting from the traffic in certain narcotic drugs, and to regulate the sale thereof." There was no attempt to question the constitutionality of the act, but the caption was referred to simply for the purpose of supporting the position that the intention of the legislature was to prevent the sale of narcotic drugs, and not to make it a penal offense to give away such drugs or administer a narcotic drug to alleviate suffering.

The act in question was passed by the legislature by virtue of the broad police powers of the State, not only to prohibit the traffic in such dangerous drugs, but also to protect the victim of the habit by making it difficult for such victim to obtain the drug. In other words, the act was aimed at both the evil of the traffic and the evil of the habit. This, we think, is clearly indicated in the body of the act. It expressly makes it unlawful for any person to either "sell, furnish, or give away" any of the narcotic drugs mentioned in the act, except upon the written order or prescription of a lawful practitioner of medicine, dentistry, or veterinary medicine; and, in furtherance of the purpose to prevent the evils of the habit, the act further provides that it shall be unlawful for any practitioner of medicine, dentistry, or veterinary medicine to furnish or prescribe any of the narcotic drugs mentioned "for the use of any habitual user of the same." Under the express terms of this act, therefore, we must hold that it is a violation of the statute for any person either to sell, furnish, or give away any of the narcotic drugs mentioned in the act without a written order or prescription as therein provided.

It is insisted in the next place that the charge of involuntary manslaughter in the commission of an unlawful act can only be predicated upon an act that is malum in se, and can not be based

upon an act malum prohibitum, and in support of this position the authorities cited in 21 Cyc. 761, 765, are given. Whether the adminstration of morphine is an act evil in itself would, of course, largely depend on the amount, and on the circumstances under which it was administered. Administration in small amounts and to alleviate pain might be construed as a beneficent act, but administration without this purpose, or to one who habitually uses it, might well be considered a wrongful act. However this may be, under the statute of this State the administration of morphine in any quantity or for any purpose, except under prescription as provided by the statute, is unlawful; and the Penal Code, § 67, declares that "involuntary manslaughter shall consist in the killing of a human being without any intention to do so, but in the commission of an unlawful act." In *Hayes* v. *State,* 11 *Ga. App.* 371 (75 S. E. 523), it is said: "An unlawful act within the meaning of our statute is an act prohibited by law, that is to say, an act condemned by some statute or valid municipal ordinance of this State. In order, therefore, to support an indictment for involuntary manslaughter in the commission of an unlawful act, some act must be alleged which is prohibited by a valid law." The administration of morphine without a prescription being unlawful under the statute of this State, it follows that where death ensues from such unlawful and intentional administration of morphine, the person so administering the morphine is guilty of involuntary manslaughter in the commission of an unlawful act. The question made by counsel for plaintiff in error seems to be settled by the statute and the decision of this court. Even if this were not so, we would hesitate to concur in the soundness of the view that the unlawful act which constituted an element of involuntary manslaughter must be one malum in se; for, outside of those things which are condemned as evil or wrong by the Holy Scriptures, the question of what would be evil or wrong in its nature depends on individual conception and environment.

The following charge of the court is objected to: "If he intended to commit the act,—that is, to administer the drug described,—and death resulted from that, then the offense would be complete." It is insisted that this charge took away from the jury the right to decide whether, under all the facts and circumstances of the case, the offense of involuntary·manslaughter had

been committed at all by the defendant, and because it amounted to an expression of opinion that the defendant was guilty as charged, and also because it incorrectly laid down the rule with reference to death resulting from an unlawful act, in that it did not state that in order for the offense to be complete, death must result directly and proximately from the unlawful act. We think this excerpt from the charge is not subject to the criticism upon it, and that it clearly states the law pertinent to the contentions. If one intentionally does a wrongful act, he is liable for the natural and probable consequences of the act. The very definition of involuntary manslaughter shows that although the homicide be not intended by the party committing the unlawful act, yet if the unlawful act be intentionally committed, the party committing it would be responsible for the consequences resulting therefrom.

It is earnestly insisted that the trial judge erred in permitting the solicitor-general to read, over the objections of the defendant, certain extracts from a book known as "Bartholow's Materia Medica and Therapeutics," relating to the properties of the drug viburnum, and its effect upon the human system, and also in permitting the solicitor-general to read these extracts to the jury as a part of his argument, the objection being that the book was not in evidence, and was no part of the record. The trial judge, referring to this ground of the motion for a new trial, makes the following statement in his order overruling the motion: "Whilst the decisions are conflicting on the subject of the 8th ground, and there is no positive adjudication in Georgia on that point, it is fair to assume if the action permitted stood by itself, it would be held to be error. Whether it was harmful error, necessitating the grant of a new trial, will be referred to later herein. The reading of the book to the jury was not begun by the prosecuting officer. The defendant's counsel sought and obtained the consent of the judge, over the objection by the solicitor-general, to read to a witness extracts from the book; and to establish the reliability of the work itself. This was error on the part of the court, but it is not error of which the defendant can complain, since he induced the ruling, and he must therefore abide by the consequences of his act. Two wrongs do not make a right, but one error may make that innocuous which by itself would be error. A paper might not be admissible in evidence, but if one of the parties introduces a part

of it he can not object to references to other portions which he may not wish the jury to hear. That is precisely what the defendant himself did in this case. Not only did counsel read to the witness in the hearing of the jury extracts from the book and seek and obtain commendation of the work from the witness, but the defendant, whilst making his statement, read to the jury an extract from the book. His position thus being that the book was credible and the publication having been established, and its contents, so far as it suited the defendant's purposes, read by him to the jury, why should the solicitor-general not read that portion on the same subject which follows? It could not have been harmful error, since what the solicitor-general read had already been established by witnesses. But more than this, it was absolutely harmless error— no more error than reading Phillips' Famous Cases of Circumstantial Evidence, or the Declaration of Independence; for no one contended that viburnum had killed the deceased. It was a question between the absolute poison of morphine and club sandwiches. Apparently viburnum could have been taken as freely as soda-water, but the one thing which would produce the characteristic signs apparent on the dying girl was morphine. She had been given morphine, through injection, by the defendant; the signs of morphine poison were present, and we might with equal advantage speculate on death by lightning from a clear sky as consider any other means of death than the one set forth in the indictment and demonstrated by the evidence."

We adopt in part what has been so well said by the trial judge in discussing this ground. It is perfectly manifest that even if it had been erroneous to permit the solicitor-general to read from this book the effect of viburnum on the human system, it was harmless error. The evidence demanded a finding that the cause of the death of the girl was an overdose of morphine. There was no pretense that her death was caused or contributed to by viburnum. It is true the evidence shows that she took about an ounce of viburnum just after the morphine had been injected into her hip; but the evidence is uncontroverted that this quantity of viburnum was absolutely harmless. For myself I do not see any logical reason why the statement of an expert scientist contained in a book would not have as much value as a mere expert opinion of a scientist

on the same subject, made on the witness stand. The only difference, of course, would be that in the one case there would be the right of cross-examination, and in the other this right could not be exercised.

The other special assignments of error contained in the motion for a new trial have either been abandoned or are without merit. The controlling question in the case under the evidence was whether the decedent died from the effects of morphine poisoning or ptomaine poisoning. The expert evidence on the subject demanded the verdict that she died from morphine poisoning. The contention that she died from the effects of ptomaine poisoning is an inference from the following facts: The decedent and another girl both received hypodermic injections of morphine at the same time; both girls also ate of club sandwiches and drank of beer; one girl vomited and did not die, the other girl failed to vomit and died, and therefore it was what they had eaten and drank, and not the morphine injected into the blood, which caused the death. This inference is not without some force, but its weakness consists in the fact that no two persons are affected in the same manner, either by what they eat or drink or by morphine. The effect of food or medicine upon a person largely depends upon the physical condition of the subject, and, as to a particular drug, upon habit. But this discussion is academic, for the evidence is clear and strong that the decedent died from the effects of morphine poisoning; certainly the jury were authorized to accept this theory of the evidence. We fail to find any error in the record that would warrant the grant of another trial.                    *Judgment affirmed.*