## MORELAND *v.* THE STATE.

Two men, on a rainy day, were traveling in an automobile on a public highway in this State. One was the owner of the car, and the other was the owner's chauffeur, who was driving. While the automobile was moving at the rate of fifty miles an hour, and as it approached a sharp curve on the highway and on the wrong side of the highway, at the same unlawful rate of speed, it collided with another automobile which was being driven in the opposite direction, and the collision caused the death of a woman who was riding in the latter car. At the scene of the collision, and almost immediately thereafter, the chauffeur stated that he lost control of the car when he attempted to wipe the rain off the windshield. The owner and the chauffeur were both indicted for murder, and the owner was put upon trial and convicted of involuntary manslaughter in the commission of an unlawful act; the chauffeur not being apprehended. The evidence authorized a finding that the woman was killed by the chauffeur, the operator of the automobile, without intention to do so, but in the commission of an unlawful act which in its consequences did not naturally tend to destroy a human being. There was no evidence authorizing a finding that the owner was operating the automobile at any time, or that he directed the chauffeur in the operation, or aided,

Homicide, 29 C. J. p. 1149, n. 49; p. 1153, n. 86, 87, 90; p. 1159, n. 49 New; 30 C. J. p. 317, n. 71.

abetted, or concurred in the unlawful manner in which the car was operated, except the following facts: The owner was riding in the car while his chauffeur was driving it in an unlawful manner, as stated. About five minutes after the collision the owner said to the chauffeur, "We must catch the train and get away from here;" and the chauffeur soon afterwards left the scene and has never been apprehended. About an hour after the collision the owner appeared at the railroad office in Marietta and bought two tickets· to Chattanooga. Another man was with him. The next train left for Chattanooga about fifteen minutes afterwards. About three hours after this train left Marietta, the owner was arrested in a taxicab ·near Marietta, and while being driven· towards that city. *Held,* that a verdict finding the owner guilty of involuntary manslaughter in the commission of an unlawful act was authorized as a matter of law.

No. 5711. July 14, 1927.

Question certified by Court of Appeals ·(Case No. 17543).

*Fred Morris, Lindley W. Camp,* and *Branch & Howard,* for plaintiff in error.

*George D. Anderson, solicitor-general,* contra.

Hill, J. The Court of Appeals desires instructions from the Supreme Court upon the following question:

"Moreland and Bray were jointly indicted for murder. Moreland alone was tried (Bray not having been apprehended), and was convicted of involuntary manslaughter in the commission of an unlawful act. The evidence authorized a finding of the following facts: The two men, on a rainy day, were traveling in an automobile on a public highway in Cobb County, this State, to wit, the public highway from Atlanta to Marietta. Moreland was the owner of the car, and Bray was Moreland's chauffeur and the driver of the car. While the automobile was moving at a high rate of speed, it collided with another automobile which was being driven in the opposite direction on the highway, and the collision caused the death of a woman who was riding in the latter car and who was the person that the accused were charged with murdering. The scene of the collision was at a point between Atlanta and Marietta, and some two or three miles from Marietta. At the time of the collision the automobile in which the accused were riding was being operated by Bray in an unlawful manner, in that it was being driven on a public highway at an unlawful rate of speed, to wit, fifty miles an hour, and approached a sharp curve on the highway at the same unlawful rate of speed, and was being driven on the wrong ·side of the highway. Bray stated at

the scene of the collision and almost immediately thereafter that he lost control of the car when he attempted to wipe the rain off of the windshield, and this statement was undisputed, and the uncontradicted evidence showed that at the time of the collision it was raining hard. The evidence authorized a finding that the woman killed was killed by Bray, the operator of the automobile, without intention to do so, but in the commission of an unlawful act which in its consequences did not naturally tend to destroy the life of a human being. There was no evidence authorizing a finding that Moreland was operating the automobile at any time. There was no evidence showing or tending to show that Moreland was directing Bray in the operation of the automobile, or that Moreland was aiding, abetting, or concurring in the unlawful manner in which it was being operated, except the following facts (which the jury were authorized to find from the evidence) : (1) Moreland was the owner of the automobile and was riding in it while Bray, his chauffeur, was driving it in the unlawful manner previously stated. (2) About five minutes after the collision occurred, Moreland said to Bray, 'We must catch the train and get away from here,' and Bray soon afterwards left the scene and has never been apprehended. (3) About an hour after the collision, Moreland appeared at the railroad office in Marietta and bought two tickets to Chattanooga; there was another man with him; the next train left for Chattanooga about fifteen minutes afterwards; and about three hours after this train left Marietta, Moreland was arrested in a taxicab near Marietta and while being driven towards that city. Under the above-stated facts, was the verdict finding Moreland guilty of involuntary manslaughter in the commission of an unlawful act authorized as a matter of law ?"

The Penal Code of 1910, § 67, provides that "Involuntary manslaughter shall consist in the killing of a human being without any intention to do so, but in the commission of an unlawful act, or a lawful act, which probably might produce such a consequence, in an unlawful manner: provided, that where such involuntary killing shall happen in the commission of an unlawful act which, in its consequences, naturally tends to destroy the life of a human being, or is committed in the prosecution of a riotous intent, or of a crime punishable by death or confinement in the penitentiary, the offense shall be deemed and adjudged to be

murder." In *Silver* v. *State*, 13 *Ga. App.* 722 (79 S. E. 919), it was held that the charge of involuntary manslaughter in the commission of an unlawful act can be based upon an act malum prohibitum as well as upon an act malum in se. Under an act of the legislature (Ga. L. 1921, pp. 255, 256, 8 Park's Code Supp. 1922, §§ 828(uu-3), 828(uu-4), Michie's Georgia Code 1926, § 1770(51)), it is provided that "No person shall operate a motor-vehicle or motorcycle upon any public street or highway at a speed greater than is reasonable and safe, not to exceed a speed of thirty miles per hour, having due regard for the width, grade, character, traffic, and common use of such street or highway; or so as to endanger life, limb, or property, in any respect whatever. Upon approaching any intersecting highway, bridge, railroad crossing, dam, sharp curve, dugway or deep descent, or in traversing such intersecting highway, bridge, railroad crossing, dam, sharp curve, dugway or descent, the operator of a motor-vehicle or motorcycle shall at all times have said vehicle under immediate control, and shall not operate said vehicle at a greater speed than ten miles per hour." The act of 1921 further provides that "Whenever any operator of a motor-vehicle or motorcycle shall meet, on a public street or highway, any person riding or driving one or more horses or any other draft animal, or any other vehicle, approaching in the opposite direction, the operator shall turn his vehicle to the right so as to give one half of the traveled roadway, if practicable, and a fair opportunity to the other to pass by without any unnecessary interference; and if traveling in the same direction, he shall pass to the left side of the person or vehicle overtaken, and the person or vehicle overtaken shall give him a fair opportunity to pass." Park's Code Supp. 1922, § 828(uu-7). The exact question here involved seems not to have been decided by this court. But in other jurisdictions it has been decided. In Commonwealth v. Sherman, 191 Mass. 439 (78 N. E. 98), the fourth headnote is as follows: "In a prosecution for operating an automobile at an excessive rate of speed, proof that the machine, which was registered with the Massachusetts Highway Commission by defendant in his own name, was being run by the operator at an illegal speed while defendant was in the tonneau, established prima facie that defendant, having power to control the machine, either knew, or allowed it to be illegally run, and was therefore guilty." In that

case Sherman was convicted of driving an automobile on a public highway at a rate of speed exceeding twelve miles per hour. The defendant was in the automobile at the time and place alleged in the complaint; the automobile was going at a speed in excess of twelve miles per hour, and twelve miles per hour was the maximum at which automobiles were allowed to go by the established by-laws of the town; the defendant was not operating or driving the car himself, but was seated in the tonneau. On these facts the defendant requested the court to rule that he could not be convicted; and the court having refused so to rule, the jury returned a verdict of guilty. The Supreme Court of Massachusetts sustained the ruling of the lower court. In 28 Cyc. 38 (e), it is said: "Where an injury is inflicted by the use or operation of a motor-vehicle upon the public highways, the owner thereof is liable to respond in damages therefor, if the vehicle was being operated by such owner or was under his control, or was in the custody or control of his agent or servant acting within the scope of his employment and for the benefit of the owner. In all cases where the owner is present he will be responsible for injuries sustained by third persons, unless the operator disobeys instructions, as the owner is in law in control of the vehicle." It is true that this refers to a civil case and an action for damages, but it states the principle that the owner of an automobile under such circumstances is in control of the machine and would be liable in damages unless the operator disobeys the instructions of the owner. Under the above definition of what constitutes involuntary manslaughter in the commission of an unlawful act, there can be no question that that offense was committed by whomever was responsible for the operation of the automobile in question at the time of the unfortunate homicide. Whoever was responsible, it can not be questioned under the facts as stated by the Court of Appeals that the automobile of Moreland was being operated in violation of the law of this State. It was being run at a rate of fifty miles per hour, when the law says that it could be run upon the public highway at a rate not exceeding thirty miles per hour. It was in violation of the law which prevents one vehicle passing another on the wrong side of the road. It was violating the law in running at a rate of speed in violation of a penal statute which provides that on a sharp curve an automobile shall not exceed the speed of ten miles per hour.

And the sole question to be decided is, is Moreland, the owner of the automobile, liable for the acts of his chauffeur done in his presence. He was present, and there is nothing to indicate that he remonstrated with the chauffeur, or attempted to prevent him from running at the high rate of speed of fifty miles per hour, around a curve, while it was raining. Under these circumstances we are of the opinion that the owner of the car was in control thereof, and that he should have seen to it that his chauffeur did not operate the car in such a manner contrary to law as might produce such a consequence in an unlawful manner as that which happened on this fateful occasion. It must be held, therefore, that the owner of the car must have known, and did know, that it was being operated contrary to law, and that he consented and agreed to the running of the car at such a high rate of speed; and that being true, he is responsible for what happened in consequence of such violation of the law. It would be the owner's duty, when he saw that the law was being violated and that his machine was being operated in such a way as to be dangerous to the life and property of others on the highway, to curb and restrain one in his employment and under his control, and prevent him from violating the law with his own property. The owner of the automobile was bound to know that it was very dangerous for his chauffeur to run and operate the car at fifty miles per hour during a rainstorm along a public highway and at a dangerous curve. He was bound to know that a car operated at such a place and in such a manner was liable to come in collision and injure occupants of other automobiles upon the highway; and that being so, he was equally guilty with his employee in causing the homicide in question, although he may have had no intention of injuring or killing the woman in question. It is not insisted that the operator of the car, or the owner, wilfully intended to kill the party named in the indictment. As already stated, it is a question of intentional neglect not to curb the operator of the car when he was violating the highway law of the State. Nor is it a question here that the owner and operator of the car entered into a conspiracy to kill the party so killed, or any one else. The question of conspiracy is not involved.

· So we reach the conclusion that the question propounded by the Court of Appeals must be answered in the affirmative.

*All the Justices concur.*

BECK, P. J., and GILBERT, J., concurring specially. We agree that the question is answered correctly, but dissent from the view that the question, as propounded, is such a question as is contemplated by the constitution, authorizing the Court of Appeals to certify questions to this court. As we view the question, it simply inquires whether certain stated facts are sufficient to authorize the verdict rendered by the jury. In *Lynch* v. *Southern Express Co.,* 146 *Ga.* 68, 71 (90 S. E. 527), a decision concurred in by all the Justices, this court said: "With a view of preserving uniformity of decision, the constitution provides for the certifying of constitutional questions to the Supreme Court, and further provides that 'The Court of Appeals may at any time certify to the Supreme Court any other question of law concerning which it desires the instruction of the Supreme Court for proper decision; and thereupon the Supreme Court shall give its instruction on the question certified to it, which shall be binding on the Court of Appeals in such case. The manner of certifying questions to the Supreme Court by the Court of Appeals, and the subsequent proceedings in regard to the same in the Supreme Court, shall be as the Supreme Court shall by its rules prescribe, until otherwise provided by law.' Constitution of Georgia, art. 6, sec. 2, par. 9 (Civil Code of 1910, § 6506). Two features stand prominent in this constitutional provision: one is that the question certified is to be one of law; and the other is that the purpose of the certification is to settle the question of law for application by the Court of Appeals in a 'proper decision' of the case by them. There can be no doubt that the words, 'question of law,' as used in the constitution, considered abstractly or in connection with the context, were not intended to embrace questions of fact, or mixed questions of law and fact; the manifest object being to submit to the Supreme Court a definite question of law. The propriety of granting a nonsuit or of directing a verdict depends upon the effect to be given the evidence."

In *Louisville &c. R. Co.* v. *Hood,* 149 *Ga.* 829 (102 S. E. 521), the same subject was discussed. The above extract from the *Lynch* case was quoted and approved, and it was said that "the ruling made in the *Lynch* case, supra, has been followed in subsequent decisions by this court." In the *Lynch* case the question propounded was whether the evidence was sufficient to withstand

a motion to nonsuit or direct a verdict. In the later case above cited, the Court of Appeals set out the evidence at length and then inquired whether, "under such circumstances, the plaintiff was entitled to recover even 'if the defendant were negligent," etc. These cases, we think, definitely rule that questions like the one now under consideration are not such as the Court of Appeals may propound nor such as the Supreme Court may answer.