HUNTSINGER *v.* THE STATE.

No. 15297.   NOVEMBER 19, 1945.

128

# 130

*G. P. Martin* and *E. C. Stark,* for plaintiff in error.

*Eugene Cook, Attorney-General, Hope D. Stark, Solicitor-General, Daniel Duke, Assistant Attorney-General, George W. Westmoreland,* contra.

HEAD, Justice. (After stating the foregoing facts.) ■ Sumner Huntsinger was convicted of murder under the proviso contained in the Code, § 26-1009, defining involuntary manslaughter: "Involuntary manslaughter shall consist in the killing of a human being without any intention to do so, but in the commission of an unlawful act, or a lawful act, which probably might produce such a consequence, in an unlawful manner: Provided, that where such involuntary killing shall happen in the commission of an unlawful act which, in its consequences, naturally tends to destroy the life of a human being, or is committed in the prosecution of a riotous intent, or of a crime punishable by death or confinement in the penitentiary, the offense shall be deemed and adjudged to be murder." The above proviso was discussed by this court in *Wright* v. *State,* 166 *Ga.* 1 (141 S. E. 903). In the opinion, it was held that the proviso of the section defining involuntary manslaughter must be considered in connection with § 26-1002, which defines murder; and it was stated that there can be no murder without malice, express or implied, and that, if the indictment does not allege malice in express terms, it must do so by the employment of equivalent words; citing *Gates* v. *State,* 95 *Ga.* 340 (22 S. E. 836).

The first principle announced in the *Wright* case, supra, that statutes relating to the same subject-matter (in pari materia) should be considered and construed together, follows the rule which has been in effect in this State since the earliest opinions of this court. The rule has been more broadly expressed in *Barron* v. *Terrell,* 124 *Ga.* 1078 (53 S. E. 181), where, with reference to the effect of adopting the Code of 1895, this court held: "The effect of the act adopting the present Code was to enact into one statute all the provisions embraced in the Code. *Central R. Co.* v. *State,* 104 *Ga.* 831 (31 S. E. 531, 42 L. R. A. 518). And in construing any section of the Code, we must treat it as a single statute forming one homogeneous and consistent body of laws, and each Code section is to be considered in explaining and elucidat-

ing every other part of the common system to which it belongs."
The rule as stated in *Barron* v. *Terrell,* supra, was first laid down
in *Harrison* v. *Walker,* 1 *Ga.* 32, and followed in *Hester* v. *Young,*
2 *Ga.* 31, 43; *Henderson* v. *Alexander,* 2 *Ga.* 81, 85; *McDougald*
v. *Dougherty,* 14 *Ga.* 674; *Thomason* v. *Fannin,* 54 *Ga.* 363;
*Bealle* v. *Southern Bank of Ga.,* 57 *Ga.* 274; *Gillis* v. *Gillis,* 96
*Ga.* 11 (23 S. E. 107, 30 L. R. A. 143, 51 Am. St. R. 121); *Samp-
son* v. *Brandon Grocery Co.,* 127 Ga. 454 (56 S. E. 488, 9 Ann.
Cas. 331); *Cook* v. *Wier,* 185 *Ga.* 421 (195 S. E. 740).

The authorities cited above, holding that statutes in pari materia
are to be construed together, involved civil law. The same rule
of construction applies to sections of the Penal Code, and the con-
struction of criminal statutes. *Shaw* v. *State,* 102 *Ga.* 663 (29 S.
E. 477); *Tribble* v. *State,* 168 *Ga.* 699, 701 (4) (148 S. E. 593).

Under a proper rule of construction of the proviso in the Code,
§ 26-1009, defining involuntary manslaughter, it is not sufficient
that the killing be committed in an unlawful act which in its
consequences naturally tends to destroy the life of a human being,
but to make the offense murder, malice, either express or implied,
must exist at the time of such killing. The statement in *Wright*
v. *State,* supra, that there can be no murder without malice, ex-
press or implied, has been held by this court, in many decisions,
to be the law of this State. In *McMillan* v. *State,* 35 *Ga.* 54, it is
stated: "To make a homicide murder, malice must exist at the
time of the killing." This rule was restated in *Carson* v. *State,*
80 *Ga.* 173 (5 S. E. 295), *Mize* v. *State,* 135 *Ga.* 291, 298 (69
S. E. 173), *Reece* v. *State,* 155 *Ga.* 359 (116 S. E. 631), and
*Miller* v. *State,* 184 *Ga.* 338 (191 S. E. 115).

In *Miller* v. *State,* supra, Chief Justice Russell, for the court,
cited the case of *McMillan* v. *State,* supra, and held: "In a trial
for murder, it is absolutely necessary and essential that malice,
express or implied, be shown. Without the existence of malice,
the homicide is either justifiable or manslaughter."

In *Wright* v. *State,* 166 *Ga.* 1 (supra), Mr. Justice Hines in a
dissenting opinion quoted from the case of *McGinnis* v. *State,* 31
*Ga.* 236-262, the court in the *Wright* case having before it for con-
sideration the construction of the proviso in question, defining in-
voluntary manslaughter. The first question quoted by Mr. Justice
Hines from Judge Lumpkin's opinion in the *McGinnis* case was:

"Suppose the life of a human being is destroyed where no considerable provocation appears, and where all the circumstances of the killing show an abandoned and malignant heart, is not the offense murder?" Mr. Justice Lumpkin stated in this question the essentials of implied malice, and we agree with the conclusion reached by·him, that, where all of the facts and circumstances of the killing show an abandoned and malignant heart, the offense is murder because implied malice is shown. The next question quoted from Mr. Justice Lumpkin's opinion was: "If I discharge a loaded gun or pistol at a crowd and kill my best friend, is not this murder?" Under *Austin* v. *State,* 110 *Ga.* 748 (36 S. E. 52, 78 Am. St. R. 134), and citations, it would be murder, since a pistol is a deadly weapon, and from its reckless discharge into a crowd of persons malice will be implied as a matter of law. After quoting the two questions from Mr. Justice Lumpkin's opinion, Mr. Justice Hines proceeded in the following language: "Section 67 [now 26-1009] denounces an involuntary killing, which happens in the commission of an unlawful act which, in its consequences, naturally tends to destroy the life of a human being, as murder. The section declares that 'the offense shall be deemed and adjudged to be murder.' The statute does not make malice an ingredient of the offense so defined." The conclusion reached by Mr. Justice Hines, as quoted, is not in accord with the majority opinion of this court·in *Wright* v. *State,* supra, and is contrary to authorities cited in this case that, to make a homicide murder, malice, either express or implied, must be shown to exist at the time of the killing. The conclusion reached by Mr. Justice Hines is further in conflict with the authorities cited, in that the criminal statutes of our Code, being in ·pari materia, are to be construed together.

"Malice is the deliberate intent unlawfully to take away the life of a fellow creature, and may be express or implied." *Vincent* v. *State,* 153 *Ga.* 296 (112 S. E. 120), and citations. "Express malice is that deliberate intention unlawfully to take away the life of a fellow creature, which is manifested by external circumstances capable of proof." Code, § 26-1003. "Malice shall be implied where no considerable provocation appears, and where all the circumstances of the killing show an abandoned and malignant heart." § 26-1004. The State in this case relied upon implied

malice. Malice, the deliberate intent unlawfully to take away the life of a fellow creature, will not as a matter of law be implied in every case of homicide.

Three distinct rules as to implied malice have been announced by this court. Two of these rules were stated in *Delk* v. *State,* 135 *Ga.* 314 (69 S. E. 541, Ann. Cas. 1912A, 105), the first being as follows: "If a deadly weapon is used in the commission of a homicide, and it appears that the weapon was used in the manner in which such weapons are ordinarily used to kill, then the law would presume an intention to kill." And, under the rule stated, malice would be implied. See *Moon* v. *State,* 68 *Ga.* 688 (7). In the same opinion (the *Delk* case) the court stated the second rule: "But a deadly weapon may be used in such a manner as not necessarily to raise such a presumption, but to leave the intent as a question of fact for the jury. Thus, to strike one with the barrel of a pistol instead of shooting him with the weapon, or to strike with the handle of a dirk instead of with the blade, would not be the ordinary way of using such weapon to kill, and the intention to kill would be rather a question of fact than of presumption." Thus, malice might or might not be implied under the second rule stated, depending upon all the facts and circumstances connected with the killing. See *Hanvey* v. *State,* 68 *Ga.* 613(4).

The rules stated in *Delk* v. *State,* supra, had been expressed in *Austin* v. *State,* supra, as follows: "The mere fact that a person handles a gun in a careless and reckless manner and death results to another therefrom does not necessarily make the person handling the gun guilty of murder. In order to make such person guilty of murder, it must appear that there was an intention on the part of the slayer to discharge the gun, and the circumstances were such that an act of that character naturally tended to destroy human life. If a person recklessly discharges a gun at another, and death results therefrom, or recklessly discharges a gun into a crowd, although at no particular person, and death results to some one, it is of course settled law that such killing is murder. *Studstill* v. *State,* 7 *Ga.* 2; *Collier* v. *State,* 39 *Ga.* 31 (99 Am. D. 449); *Cook* v. *State,* 93 *Ga.* 200 (18 S. E. 823)."

The third rule is that malice, the deliberate intent unlawfully to take human life, will not be presumed as a matter of law where

the instrument employed in the taking of life is not per se a deadly weapon. In the opinion in *Farmer* v. *State*, 112 *Ga.* 81 (37 S. E. 120), this court stated: "Death having resulted from a blow inflicted by an instrument which is not shown by the evidence to be a weapon likely to produce death and one which the court would not be authorized to say as matter of law was such a weapon, the law does not presume an intention to kill from its use." In the opinion in *Dorsey* v. *State*, 126 *Ga.* 634 (55 S. E. 479), it was said: "If the jury should find that the weapon was one which would not ordinarily produce death, and therefore was not a deadly weapon, and the circumstances demonstrated to the satisfaction of the jury that there was no intention to kill, then, even though the blow was not justified, the accused would be guilty only of the offense of involuntary manslaughter."

In this case the deceased was killed by the defendant while operating his automobile on the highways of this State. An automobile is not per se a deadly weapon. When death results from the reckless or unlawful use of an automobile, and the State relies upon implied malice in the prosecution for murder in such instance, malice will be implied where all the facts and circumstances show an abandoned and malignant heart, and not otherwise.

The proviso forming a part of § 26-1009, defining involuntary manslaughter, appears to have first come into our law in the Penal Code of 1817, and it can not therefore be held that this proviso was enacted originally for the protection of persons upon the highways of this State from the unlawful use of automobiles. The automobile did not come into common, practical use until almost a century had passed after the adoption of this proviso. The legislative intent may well have been that the proviso should be applied in those cases where human life was destroyed by the use of a deadly weapon. Whatever the legislative intent may have been originally, the proviso will not now be applied to a legal, lawful, and necessary means of transportation, unless it be shown, where death results from the operation of an automobile, and the prosecution is relying upon implied malice, that all the facts and circumstances show an abandoned and malignant heart.

L. A. Langford, the only eyewitness to the killing in this case, testified on cross-examination in part as follows: "It seems that

Huntsinger's car went into a skid just before the impact, it seems he was trying to get it back into the road. By pulling the car to the left with all the force you could would make the right-hand rear of the car go into a skid, and that is exactly what happened out there. . . When I observed Mr. Huntsinger, his car was in a skid and he was doing his best to pull it back. I don't know what happened to cause his car to be off the road. When Mr. Vandiver said 'Look there,' Mr. Huntsinger's car was in a skid."

Frank Jones, a State trooper, testified for the State, basing his evidence on an examination of the highway at the point of the homicide, and after the homicide, in part as follows: "This car that Mr. Huntsinger was driving from the evidence got off the pavement 43 feet before the collision. He was skidding sideways. He got off of the road before he got to the filling station. Yes, he went into a skid before he hit. The side of Huntsinger's car hit the rear of Vandiver's car. Huntsinger's car had to be in a skid at the time of the impact."

H. A. Crow, State trooper, testified in part as follows: "The car [Huntsinger's automobile] skidded some 43 feet before the impact. That curve in the direction Huntsinger was going would be on the outside. Going round that curve, whether due to speed or mechanical imperfection, or what not, whatever happened to throw the car off the road 43 feet, with the driver attempting to get the car back in the road would put the car in a skid. And, if he slapped on his brakes, it would get him in a bad skid, and would likely turn him over."

The evidence above quoted shows that at the time and place of the homicide the defendant was undertaking to regain control of his automobile, which, under the testimony of the eyewitness Langford, was out of control, and to return the automobile to its rightful position on the highway. Had the defendant been able to return his car to its rightful position, on the highway, the homicide would not have happened, because the deceased was standing several feet off of the highway at the entrance of a filling station. It is not sufficient that some inference from the evidence will support the jury's findings as to one issue in the case, but where implied malice is relied upon to make the homicide murder, all of the facts and circumstances of the killing must show an abandoned and malignant heart. As a result of the defendant's inability

to return his car to its rightful position upon the highway, the deceased was killed, the automobile of the defendant was wrecked, and the defendant received serious personal injuries. The defendant insists that the killing was an unavoidable accident. It is but applying the rule of common experience to believe that every individual in his right mind, finding himself in a perilous position where serious physical injuries to himself may be anticipated, will use every means possible to avoid the impending injuries to himself; and this is true regardless of the fact that the perilous situation confronting such person may have been brought about by reckless or even unlawful conduct on his part. The evidence of Langford can not be said as a matter of law to refute the inference, which here appears, that the homicide may have resulted from some mechanical imperfection of the defendant's car. It is true that there is sufficient evidence in the record to warrant the jury's finding that the defendant at the time and place of the homicide was operating his automobile in violation of the speed laws of this State; but the operation of an automobile at a speed in excess of that authorized by law does not exclude the possibility that the driver's inability to return the car to the highway, when he attempted to do so, was due to a mechanical cause or defect.

It is insisted in the case now before the court that the opinions in *Butler* v. *State,* 178 *Ga.* 700 (173 S. E. 856), *Jones* v. *State,* 185 *Ga.* 68 (194 S. E. 216), *Meadows* v. *State,* 186 *Ga.* 592 (199 S. E. 133), *Powell* v. *State,* 193 *Ga.* 398 (18 S. E. 2d, 678), and *Josey* v. *State,* 197 *Ga.* 82 (28 S. E. 2d, 290), are in point and are controlling in this case. We can not agree with this contention. Each of those cases is clearly distinguishable on its facts from the present case.

In *Butler* v. *State,* supra, the evidence for the State was to the effect that the defendant, while driving his automobile at a high rate of speed, turned it across the highway and struck the deceased, who was riding on a bicycle; and that thereafter the defendant speeded up his car and left the scene of the homicide. There was evidence for the State that he was under the influence of intoxicating beverages, and other evidence that he was drunk.

In *Jones* v. *State,* supra, there was evidence for the State that, in addition to violating the law regulating the speed of automobiles, the defendant was under the influence of intoxicating liquor at the

time of the homicide. In that case, the authorities cited for the legal conclusions reached in the opinion are the dissenting opinion of Mr. Justice Hines in *Wright* v. *State,* supra, and a quotation from the Virginia courts, which does not show the Virginia statute involved or the facts of that case.

In *Meadows* v. *State,* supra, the evidence for the State not only included a violation of the law regulating the speed of automobiles, but there was evidence of a violation of the statute with reference to the operation of automobiles while under the influence of intoxicating liquors.

In *Powell* v. *State,* supra, the evidence for the State was to the effect that the automobile in which the deceased was riding was on its right-hand side of the road, and went into the ditch in order to avoid a collision; that the automobile operated by the defendant, who was under the influence of intoxicating liquors, crossed the highway and collided with the automobile occupied by the deceased, causing her death.

In *Josey* v. *State,* supra, the evidence for the State showed that the defendant drove his automobile through a body of soldiers who were drilling on a public street, knocking down from 10 to 15; that when the impact slowed his car, the defendant speeded up his car and ran over one soldier and killed him; and that the defendant left the scene of the killing. There was evidence that the defendant was under the influence of intoxicating liquors, or that he had used intoxicating liquors prior to the killing.

In addition to any other unlawful acts, it appears that each of the defendants in the cases relied upon by the State had either used intoxicating liquors preceding the homicide or was drunk at the time of the homicide. In the present case, there is not a scintilla of evidence that the defendant Huntsinger was, at the time and place of the homicide, under the influence of intoxicating liquors. The State relied in its case against Huntsinger on the speed of the automobile as being such an unlawful act as in its consequences naturally tends to destroy the life of a human being; and it appears from the record, including the charge of the court, that the State, to support a conviction of murder in this case, is relying upon implied malice, "where all the facts and circumstances of the killing show an abandoned and malignant heart." Independently of any theory of the defense in this case that the

homicide resulted from accident or some mechanical imperfection of the automobile, is the evidence sufficient to show by all of its facts and circumstances an abandoned and malignant heart, under the definition of implied malice?

In *Moreland* v. *State,* 164 *Ga.* 467 (139 S. E. 77), Moreland and Bray were jointly indicted for murder. Moreland alone was tried and convicted of involuntary manslaughter in the commission of an unlawful act. The case came to this court, in November, 1926, on a certified question from the Court of Appeals as to whether the conviction of Moreland of involuntary manslaughter in the commission of an unlawful act was authorized as a matter of law. The evidence recited in the opinion of this court shows that the two men, on a rainy day, were traveling in an automobile on a public highway; and that Bray was Moreland's chauffeur, and the driver of the automobile. While the automobile was moving at a high rate of speed it collided with another automobile, which was being driven in the opposite direction on the highway, and the collision caused the death of a woman riding in the latter car, who was the person the accused were charged with murdering. This court summarized the evidence in part as follows: "At the time of the collision the automobile in which the accused were riding was being operated by Bray in an unlawful manner, in that it was being driven on a public highway at an unlawful rate of speed, to wit, fifty miles an hour, and approached a sharp curve on the highway at the same unlawful rate of speed, and was being driven on the wrong side of the highway. Bray stated at the scene of the collision and almost immediately thereafter that he lost control of the car when he attempted to wipe the rain off the windshield, and this statement was undisputed, and the uncontradicted evidence showed that at the time of the collision it was raining hard." Under this statement of fact the court held: "The evidence authorized a finding that the woman was killed by the chauffeur, the operator of the automobile, without intention to do so, but in the commission of an unlawful act *which in its consequences did not naturally tend to destroy a human being."* (Italics supplied.) The court sustained the conviction of Moreland as the owner of the automobile for the offense of involuntary manslaughter. Since the indictment was for murder, had a new trial been granted the defendant might on retrial have been convicted of

this offense, except for the fact that murder was excluded under the decision of this court. To sustain a conviction where only involuntary manslaughter was involved, the court could have used the following language: "The evidence authorized a finding that the woman was killed by the chauffeur, the operator of the automobile, without intention to do so, but in the commission of an unlawful act." But this court went further and added, after the word "act," the words, "which in its consequences did not naturally tend to destroy a human being," and by the use of such language excluded any possibility of a conviction for murder under the facts of the case if it should be sent back for a new trial.

The violation of the speed laws in the *Moreland* case, and in the case now before the court, was about the same, since at the time of the acts committed in the *Moreland* case the law limited the speed of automobiles to 30 miles per hour, under the act of 1921 (Ga. L. 1921, p. 256). Thus the car was being operated at a speed 20 miles per hour in excess of that allowed by law. Witnesses in the present case placed the speed of the defendant's car at from 60 to 80 miles per hour, the lawful speed being 55 miles per hour. Ga. L. 1939, pp. 295-303. Improved and safer highways and mechanically better automobiles in 1939, as compared with the highways and automobiles in use in 1921, may well have been given consideration by the General Assembly in increasing the lawful rate of speed for automobiles. The result of the change is that in this case the speed of the defendant's automobile in excess of that allowed by law was no greater than in the *Moreland* case. Unlawful speed is the element relied upon to support the theory that Huntsinger was in the commission of an unlawful act which in its consequences naturally tends to destroy the life of a human being. In the *Moreland* case, an equal violation of the speed laws, plus operation of the car around a sharp curve on the wrong side of the road, at a time when it was raining hard, was said by this court to be the commission of an unlawful act which in its consequences did not naturally tend to destroy a human being.

"It is incumbent on the State, in criminal cases, to prove every accusation it makes." *Clark* v. *State, 37 Ga.* 191. Under the general grounds in the motion for new trial, it is a question of law whether the verdict is contrary to the evidence and without evidence to support it. *Cook* v. *State, 29 Ga. 75.* The evidence in

this case does not show any automobiles on the highway at or near the scene of the homicide. If the defendant was operating his automobile at an unlawful rate of speed, as found by the jury, such operation was not in congested traffic. The homicide occurred, not on the highway, but off the highway, and the evidence for the State shows that the defendant was trying to right his car and return it to the highway. Under all the evidence in this case, the acts committed by the defendant can not be said to have been such acts as, in their consequences, would naturally tend to destroy the life of a human being; and the State having relied upon implied malice to establish that the homicide was murder, and implied malice not being shown by the evidence, and all legitimate inferences which the jury were authorized to draw therefrom, the verdict is contrary to the evidence and without evidence to support it.

The rulings made on special grounds 4, 5, 6, and 7 of the amended motion for new trial do not require elaboration.

*Judgment reversed. All the Justices concur, except Bell, C. J., and Candler, J., who dissent.*

ATKINSON, Justice, concurring specially. I concur in the judgment of reversal in this case, but do not concur in the reasons therefor as stated in the opinion.

The evidence in this case shows no specific intent to kill. There are two instances where an involuntary killing may be murder, to wit:

(a) Where the killing happened in the commission of an unlawful act which in its consequences naturally tends to destroy human life, as set forth in the Code, § 26-1009, defining involuntary manslaughter but expressly providing that if the killing occurs under the foregoing circumstances it will be deemed and adjudged to be murder. *Leonard* v. *State,* 133 *Ga.* 435 (5) (66 S. E. 251); *Gadsden* v. *State,* 134 *Ga.* 785 (2) (68 S. E. 497); *Josey* v. *State,* 137 *Ga.* 769 (4) (74 S. E. 282); *Ashford* v. *State,* 144 *Ga.* 832 (3) (88 S. E. 205); *Davis* v. *State,* 153 *Ga.* 154, (112 S. E. 280),

(b) Where the conduct of the accused is such as to show a wanton and reckless state of mind which would be the equivalent of a specific intent to kill. *Myrick* v. *State,* 199 *Ga.* 244 (34 S. E. 2d; 36), and citations.

In either of the foregoing two instances, the conduct of the accused would amount to the same as a specific intent to kill; and, where such conduct was the proximate cause of the killing, malice would therefore be implied under the provisions of the Code, § 26-1004, defining implied malice.

Under the instance (a), above stated, the mere fact that the act causing the homicide was unlawful, standing alone, would not authorize a verdict of murder. It would be involuntary manslaughter. For the unlawful act to increase the crime from involuntary manslaughter to murder, it must be, not only unlawful, but an act which naturally tends to destroy human life. As applied to a homicide caused by driving a motor vehicle at an illegal rate of speed, whether the speed of the car in excess of the legal limitation would be an act which naturally tends to destroy human life, and would authorize a conviction of murder, would depend upon the circumstances under which the act was done. While, as above stated, the mere fact that a violation of the speed limitation was the proximate cause of the homicide, would not be murder but involuntary manslaughter—however, in determining whether the acts of the accused were sufficient to increase the crime to that of murder, consideration must also be given to other facts, such as the nature of the road, the amount of vehicles and pedestrians thereon, the amount of excess speed, the condition of the car being driven, and other like circumstances. To amount to murder, the facts must show a condition from which the accused could reasonably apprehend that his act of violating the speed limit was, under the circumstances, such an act as naturally tended to destroy human life.

Whether the unlawful act of driving a motor vehicle in excess of the speed limit is such an act as naturally tends to destroy human life, becomes a matter of fact for the jury to determine under all the circumstances. But, before the crime can be increased from involuntary manslaughter to murder, the evidence must disclose, in addition to the illegal rate of speed, facts which would authorize the jury to find the circumstances to have been such as to show that the accused should reasonably have apprehended that he was doing an illegal act naturally tending to destroy human life.

The same principle would apply where a homicide was caused

by skidding on to the shoulders of a road, and where the prohibited speed was the proximate cause of the skidding. It would be murder only when the excessive speed caused the skidding, and where such speed was under circumstances (considering the nature of the road and other conditions as above stated) which should have been reasonably apprehended as being an act naturally tending to destroy human life.

Under the instance (b), above stated, there is one marked distinction from the instance (a), heretofore discussed. Under (a) the act must be unlawful, but under (b) the act need not be unlawful, but an act such as to show a wanton and reckless state of mind which would be the equivalent of a specific intent to kill. As applied to a homicide caused by driving a motor vehicle, it is not necessary, in order for the homicide to be murder, that the accused be operating the same illegally, or in excess of the speed limit. It may be driven without violating any law, and yet if it be wilfully operated in such a manner as to show a wanton and reckless state of mind equivalent to a specific intent to kill, it would be murder and not involuntary manslaughter.

Involuntary manslaughter in the commission of a lawful act (Code, § 26-1009) may also be applicable where a homicide is caused by the operation of a motor vehicle. This section provides that involuntary manslaughter may be so committed by a "lawful act, which probably might produce such a consequence, in an unlawful manner;" and, under section 26-1010, punishment for this grade of involuntary manslaughter applies only "where there has not been observed necessary discretion and caution." The Code, § 26-404, in defining misfortune and accident, provides that in such cases it must satisfactorily appear there was no "culpable neglect." Therefore, even though the vehicle is driven legally, and a homicide occurs, it would be involuntary manslaughter in the commission of a lawful act, if the proximate cause of the homicide was the failure of the accused to exercise the necessary discretion and caution and he was guilty of culpable neglect. This grade of homicide is based upon the omission of an act, as distinguished from murder and involuntary manslaughter in the commission of an unlawful act, each of which is based upon the wilful commission of some act that is the proximate cause of a homicide.

Applying the foregoing principles to the instant case, the facts

show that the proximate cause of the homicide was the wilful operation of the automobile at an illegal rate of speed; but there are no other sufficient concomitant circumstances disclosed by the evidence which would have authorized the jury to find that the accused could have reasonably apprehended that his act of violating the speed limit was such an act as naturally tended to destroy human life, or which showed a reckless state of mind equivalent to a specific intent to kill; and accordingly a verdict of guilty of murder was not authorized.