1. The ruling on the demurrer is not assigned as error in the bill of exceptions, but is complained of only in the motion for new trial. Therefore that ruling can not be passed on by the reviewing court. McIntire v. McQuade, 190 Ga. 438, 443 (9 S.E.2d 633).
2. The Code, § 68-303, is a penal statute, designed for the purpose of protecting human life and limb, the violation of which is punishable as for a misdemeanor.
3. In misdemeanors there are no degrees of the offense; but all who participate in the commission thereof are principals and may be prosecuted as such.
4. Criminal negligence as used in the statutes of this State means not merely such negligence as might be the foundation of a damage suit, but reckless and wanton negligence and of such a character as to show *Page 804 
an utter disregard for the safety of others who might reasonably be expected to be injured thereby.
5. Here the jury were authorized to find that, even though the violation of the safety statute was unintentional, it was accompanied by a reckless disregard of consequences and was of such a character as to show an utter indifference to the rights of others, and that the participants acted as if the rights of others did not exist.
6. In a prosecution for the operation of an automobile in violation of such statute, the proof here that the defendant was the owner of the automobile and was in it at the time it collided with the automobile in which the deceased was killed while on the right-hand side of the road on which she was traveling, with the other attendant circumstances, established prima facie that the defendant himself was driving or having the power to control the automobile, and that he either knew of or allowed the illegal running of the automobile, and authorized the jury to find a verdict of guilty of involuntary manslaughter in the commission of an unlawful act.
 DECIDED MAY 7, 1946.
It was charged in the indictment that the defendant, Eugene (Buck) Thomas, "did unlawfully and with malice aforethought kill and murder one Mrs. J. A. Youngblood, a human being, by driving an automobile and/or truck against, upon, and over the body of the said person killed with such great force and violence that a mortal wound was inflicted upon the said Mrs. J. A. Youngblood from which she died." The jury found the defendant guilty of involuntary manslaughter in the commission of an unlawful act. His motion for a new trial was overruled and he excepted.
The evidence, other than that of Corporal Stephens which is quoted later, was to the effect that the deceased was in an automobile driven by her daughter on a highway; that it was struck by the automobile of the defendant driven in the opposite direction on July 4, 1945, about 6 o'clock, p. m., which inflicted injuries on the deceased from which she died 22 days later; that the automobile of the defendant which inflicted the injury was "an old automobile with part of the body off and could be used as a [kind of] pickup truck;" that the automobile in which the deceased was riding at the time of the collision was on the right-hand side of the road in the direction in which it was traveling; that the automobile of the defendant struck the automobile of the deceased on the left-hand side of the road in the direction in which the former *Page 805 
was traveling; that the deceased's automobile turned out and gave the other automobile plenty of room to pass to the left of the center of the road; that he would have "missed her from 4 to 6 feet if he had just pulled over;" that there was plenty of room for the defendant's automobile to pass the other automobile if it had traveled to the right of the center of the road in the direction in which it was going; that the defendant's car "wobbled" and came right into the automobile of the deceased; that "the road was a little sandy, but not too much. [There] wasn't any clay. It had not been raining that day;" that the defendant's automobile struck the automobile of the deceased at an angle of about 45 degrees, but there was an irregular trial of an automobile which approached the point of the collision; that the defendant stayed there a little while and the deceased talked to him; that after staying there a few minutes he went over to the automobile and got a jug and left over a fence through a field; that there were tracks across the field that led from the truck to some broom sage, where "it smelled like whisky had been poured out in broom sage;" that the defendant told the deceased, "Madam, I am sorry about this, I will pay the doctor bill;" that the defendant told him his name but had to be asked two or three times before he would tell it, and said that Franklin, one of the boys in the automobile with him, was driving his automobile; that although implored to do so, neither the defendant nor the other occupants of the defendant's automobile sent help to the deceased; that there was in the defendant's automobile at the time of the wreck "some broken 4 1/2-gallon fruit jars and smelled whisky. It looked like 2 gallons had been poured on the ground. The car was saturated with it." W. L. Avery testified: That he knew the defendant, Buck Thomas, and had known him all his life; that Thomas was driving the automobile in question when it passed his house about 6 o'clock p. m., fast time on July 4, 1945; that it was going west in the direction of where the wreck occurred; and that the wreck occurred about 2 or 2 1/2 miles from his house. Franklin Avery, son of W. L. Avery, who was at the barn of W. L. Avery, pointed out the defendant in the courtroom as the driver of the automobile as it passed his father's barn on the occasion testified to by his father. John Leach testified: That he knew where the wreck in question occurred; that the defendant passed his house on July 4, 1945, *Page 806 
about 6 o'clock p. m. fast time going in the direction of the scene of the wreck; that "if that fellow there (indicating) is Buck Thomas, he is the one that was driving," thus identifying the defendant in the courtroom as the driver of the automobile; and that the wreck occurred about a mile and three-quarters from his house. Corporal H. L. Stephens, testified for the State: "I had occasion to investigate a wreck, on July 4 [1945], between a car driven by Mr. Youngblood's daughter [the car in which the deceased was riding at the time of the collision] and a darkey. We received a call from some party at the scene or near the scene of the accident. A 1942 Pontiac and a 1934 Chevrolet pickup truck were involved in the accident. The accident occurred 3 miles south of Scott, in Laurens County. We later determined that the truck was driven by Charley Franklin. We found, upon investigation, that the truck was driving to the left of the highway, colliding with the 1942 Pontiac sedan driven by Mary Joyce Youngblood. We found that the Pontiac was approximately 2 feet from the right shoulder or right ditch. Apparently the pickup truck came off of a curve, which was approximately 500 feet away, and into a sand rut, losing control and colliding with the side of the car driven by Mary Joyce Youngblood. At the scene of the accident, we did not see the occupants of the truck at all. They had disappeared. A later investigation proved that Miss Youngblood asked them to go and bring help to the scene of the accident, and the negroes never showed up after that particular time. They were arrested sometime on or about July 23 by Trooper Gay and Trooper Davis, and the statement was given that Charley Franklin was driving the car and that Buck Thomas was the owner of it. Mrs. Youngblood was taken to the Coleman Hospital, and I couldn't tell you what injuries she actually received, that would have to be given in medical terms by the doctor. The statement was taken from Charley Franklin that he was driving. I didn't make those arrests, Trooper Davis and Trooper Gay made them. Buck Thomas was apparently arrested first. I am just reading the report. I made the investigation at the scene of the accident. At the scene of the accident were some containers completely broken, with a very vile scent of liquor or intoxicating beverage. At the scene of the accident, it was stated by Miss Youngblood that they carried two containers of the same type of *Page 807 
fluid away from the accident across the field. The car that struck Mr. Youngblood's car was on the wrong side of the road, on the left of the center line. There was no center line marked there, it was an imaginary line. The negroes' car, at approximately 45 degrees after going within range of the meeting car, it just turned . . into it and hit the left front fender and running gear of the Youngblood car, causing considerable damage to it of approximately $100 or more." On cross-examination he testified: "The speed and the sand together, I would say caused the car to lose control. I did not talk with Charley Franklin. That Charley Franklin was driving the car was the information received from him by Trooper Gay and Trooper Davis. The road at that particular point was 20 feet wide from shoulder to shoulder. There was plenty of room there to pass, provided you had the right angle in attempting to pass. I made a thorough investigation as to the cause of that wreck as far as I could go. I have been making investigations of wrecks and roads about 7 years. My investigation of this particular wreck disclosed that the cause of it was too much speed for the type of road. It is hard to tell at how much speed he was driving, nevertheless it was in excess. He would have to be driving 35 or 40 miles an hour to cause that much damage. I didn't make any arrests. I could not find them. The arrest was made on or about July 23. We attempted to make an arrest four or five times by going to Buck Thomas' house, and every time his wife would say he hadn't been there since the evening of the 3rd. I went there twice myself and then went on a vacation and instructed the men that were left to keep on until they did find him. The road at that particular point — the road was 20 feet wide. At the time of the investigation, we thought, and the information was given to us that Buck Thomas was the operator of the car, and he was the one we were looking for to find out who the other two negroes were. According to the statement, Buck Thomas was driving. I made no specific charges against Franklin."
The defendant introduced no evidence, but in his statement to the jury said: "When we had this accident with Mr. Youngblood's girl, I got out and told them I was sorry and wouldn't have it to happen for nothing in the world. She asked me to try and get some help, and I told her I would . . and I told Henry Smith *Page 808 
to get help, and he left running down the road, and we stood there talking at the car, and she told us not to say any more to her mother than we could help, that she had fallen and broke her arm and had just been to the doctor for treatment and that she had a bad heart and not to say more than we could help, and me and Charley Franklin stood there about 4 or 5 minutes, and she asked us if we reckoned the other boy is coming back, and I said, `Yes,' and she told this other boy to go and hurry him up, and I stayed there about 4 or 5 minutes after he left, and I got to studying about it, if Mr. Youngblood and them got there before anybody else, that they might hurt me. I knew that they could tell that it was my truck. I wasn't running away from this accident, I was just running away to protect myself. If I had known that the law would have been there and protected me, I would have stayed."
1. The ruling announced does not require any elaboration.
2. The Code, § 68-303 (c), provides: "An operator meeting another vehicle coming from the opposite direction on the same highway shall turn to the right of the center on the highway, so as to pass without interference." The Code, § 68-303 (e), provides: "An operator in rounding curves shall reduce speed and shall keep his vehicle as far to the right on the highway as reasonably possible." Section 68-9908 provides: "Any person violating the provisions of chapters 68-1 to 68-4, relating to licenses, registration, and operation of motor vehicles, shall be deemed guilty of a misdemeanor." In misdemeanors there are no degrees; there are no principals in the second degree, or accessories; but all who participate in misdemeanor offenses are principals and may be charged as such. Thrasher v. State,68 Ga. App. 820 (24 S.E.2d 222).
In determining whether there was criminal negligence, and if so, who was guilty thereof, the jury could have considered the type of the road in question; that the defendant had rounded a curve only 500 feet from the scene of the collision; the speed at which his automobile was traveling; the character of the surface of the road; that the defendant's automobile, with ample room to pass on its right-hand side of the road, crossed to its left side of *Page 809 
the road, struck the deceased's automobile, which was on the righthand side of the road in the direction in which the latter was traveling; other attendant facts and circumstances as they appeared from the evidence in connection with the collision; that the two boys, Franklin and Smith, were the only occupants of the defendant's automobile other than the defendant at the time of the collision; that about the time of or shortly before the collision, the defendant was driving the cut-down truck in question (his automobile) about 1 3/4 miles from and in the direction of the place where the collision occurred; that the circumstances at the time of the collision tended to show that the defendant was carrying in his automobile such a large amount of illegal liquor that he likely had a desire so intently fixed upon completing his journey and delivering the liquor to its destination that it made him so indifferent to the rights and safety of others that he acted as if they did not exist; and the jury could have found that the defendant was guilty of criminal negligence. Cain v. State, 55 Ga. App. 376 (190 S.E. 371);Collins v. State, 66 Ga. App. 325 (18 S.E.2d 24).
The testimony made out a prima facie case for the State. The defendant introduced no evidence and relied upon his unsworn statement to the jury. Under the law of this State the jury may disregard the unsworn statement of the accused entirely, if they see fit to do so. Merritt v. State, 152 Ga. 405 (2) (110 S.E. 160). Thus the jury were authorized to find that the defendant was guilty, not because he was owner of the automobile, but because he participated in the driving of his automobile, not merely in such a negligent manner as might be the foundation of a damage suit, but in a reckless disregard of consequences and utter disregard of the safety of others who might be reasonably expected to be injured thereby. Trippe v. State, 73 Ga. App. 522
(36 S.E.2d 121); State v. Richardson, 216 Iowa 809
(249 N.W. 211); Commonwealth v. Sherman, 191 Mass. 439 (78 N.E.. 98); Moreland v. State, 164 Ga. 467, 468 (139 S.E. 77). The evidence authorized the verdict of involuntary manslaughter in the commission of an unlawful act.
3. The judge did not err in overruling the motion for a new trial.
Judgment affirmed. Broyles, C. J., and Gardner, J., concur. *Page 810